CATHARINE JAMISON
BY HER NEXT FRIEND
vs.
JOSEPH JAMISON.

} MARCH TERM, 1847.

[ALIMONY.]

WHERE a separation was commenced and is continued by the act of the husband against the will of the wife, and he refuses or neglects to make provision for her support, the Court of Chancery in this state, has the power, and will decree her alimony, though there has been no divorce decreed and though the case made by the bill and proof would not, according to the ecclesiastical courts in England, entitle her to a divorce *a mensa et thoro*.

In England, alimony is granted only as a consequence or an incident, to a sentence of divorce, *a mensa et thoro*, and no such allowance will be made by the Chancery Court there until such decree of divorce has been passed.

Though in this state the Court of Chancery had no power to decree a divorce prior to the act of 1841, ch. 262, yet it had from a period prior to the revolution, full and complete jurisdiction in cases of alimony, and could, upon a proper case, decree the wife a separate maintenance out of the estate of the husband.

In England on an application for a divorce on account of cruelty, it is necessary to show that actual violence has been committed, attended with danger, or a reasonable apprehension of such violence.

The act of 1777, ch. 12, sec. 14, conferring jurisdiction upon the Chancellor in cases for alimony, gives full and complete jurisdiction over the subject, and does not restrict the court in making such allowance to the circumstances and causes which would entitle the party to a divorce according to the ecclesiastical laws of England.

There is no tribunal in this state competent to entertain a suit for the restoration of conjugal rights.

Prior to the act of 1841, ch. 262, the legislature had the exclusive power of granting divorces, and they exercised it as a regular exertion of legislative power.

There must be some method by which the husband may be compelled to maintain his wife, and when restitution of conjugal rights cannot be decreed, alimony must.

The amount of the allowance is to be determined by the value of the estate of the husband, and if the proof is not sufficiently clear to enable the Chancellor to determine such value satisfactorily, the question will be referred to the Auditor.

[The facts of this case are stated in the opinion of the Chancellor.]

24*

THE CHANCELLOR:

This is a bill filed by the complainant, praying that alimony may be allowed her out of the estate of her husband, the defendant, between whom and herself a separation in fact exists, and has existed since the year 1829.

The bill was filed in 1831, and alleges that for three or four years preceding, the conduct of the defendant towards her had been harsh, unkind and cruel, inconsistent with his duties as a husband and her claims as a wife. That on many occasions he had offered violence to her person, assaulting and beating her in an inhuman manner, notwithstanding she continued to live with him for the sake of her children, hoping that a better spirit would change his heart towards her, and restore her to his kindness and confidence. That the defendant has recently sold all his household furniture, except enough to furnish one room, which he has given to her, which she has at her boarding house, and that the only allowance he makes is barely sufficient to pay her board.

To this bill there was a demurrer, but by the Chancellor's decree of the 17th of January, 1833, the demurrer was over-ruled, and the defendant ordered to put in a good and sufficient answer, on or before the first day of the ensuing March.

The answer was accordingly filed on that day, in which the allegations of cruelty and ill treatment were denied, and in which, after insisting that the defendant had always desired to live on terms of affection with the complainant, it was averred that the separation was the result of the unreasonable and extravagant conduct of his wife, and her hasty and ungovernable temper, which upon one occasion impelled her to acts of personal violence to his person. That unable to live longer with his wife, he, the defendant, broke up housekeeping, offering at the same time to her that she should select a boarding house suitable to her condition and his means, which, with a proper allowance for her personal expenses, he would pay. That she did select such a boarding house for her accommodation, for which he has since paid at the rate of five dollars per week, a sum believed by him to be ample for the purpose, and more

than his means will justify in view of the demands upon him for the support of his children.

After the filing of this answer no further steps appear to have been taken in the cause until the 28th of July, 1845, when a supplemental bill was filed, in which it was alleged that since the separation, which still continued, the complainant had several times sought a reconciliation, and offered again to live with her husband, but that such, her offers, had been repulsed and rejected by him, and that he has, for a considerable period, failed to supply her with the necessary support and maintenance, thereby rendering her dependent upon the benevolence of friends for subsistence, and that she has understood, and charges, that he has resolved and declared his purpose to withhold from her all support. This bill likewise reiterates the charge in the original bill, that the defendant was endeavoring, by fraudulent conveyances and transfers of his property, to prejudice and anticipate her claims upon him. That the defendant will neither permit her to live with him, nor while apart from him, and kept so apart by his own determination, afford the maintenance which, as her husband, he owes her, and the law exacts from him. This bill concludes with a prayer for alimony and general relief.

The answer was filed to this bill on the 16th of March, 1846, in which all its allegations are roundly denied.

A commission then issued, under which numerous depositions were taken, and much written evidence produced and filed. It may not be considered necessary, and would certainly occupy a great deal of time and space to refer particularly and in detail to this proof. It may be sufficient to say that it does not very clearly appear, which of these two parties was most to blame for the discord which marred their domestic happiness whilst they lived together as man and wife. That there were faults on both sides, and that each occasionally yielded too far to the dominion of temper and the spirit of dissension, seems to be quite apparent from an examination of the proof.

It seems, however, to the court, that three propositions of fact are sufficiently established by the evidence, and it will re-

main to be considered, when they are stated, how far they entitle the complainant to the relief sought by her bill.

The first of these facts is, that the separation of these parties (whatever may have been his motive or provocation) was the act of the defendant, and in opposition to the wish of the complainant.

This fact is established beyond doubt or controversy by the answer of Henry Myers, at page 12, to the 3d interrogatory on the part of the complainant. Mr. Myers states that he was called by defendant as a witness, that he had requested or ordered his wife to leave his house. That he was about to break up housekeeping; that she must select a respectable boarding house, and that he would be responsible for her board. This determination, the witness says, was expressed in a positive and decided manner by the husband, was received by the wife with tears and on her knees, with entreaties that he would not pursue that course, imploring him to try to live together; that she would do all in her power to make his time or life agreeable, and appealing to him on account of their children. These entreaties and propositions he rejected, saying his mind was made up.

As no effort has been made to impeach or contradict this witness, the facts deposed to by him must be regarded as established.

The second fact is, that this separation, as it was originally the act of the defendant, continues now by his will, and against the will and wish of his wife, and in defiance of the desire to return to his society and protection.

This fact, the Chancellor considers as established by the answers of C. C. Jamison and Joseph Jamison to the complainant's 2d interrogatory, and by the answer of T. Wallace Jamison to the fifth interrogatory on the part of the complainant.

The third fact, which may be regarded as proved, is, that since the year 1840, the defendant has discontinued the regular payment of the allowance which he had previously made his wife, having since then only paid her some inconsiderable sum of money.

The answer of T. Wallace Jamison to the 12th interrogatory, together with complainant's receipts, none of which appear to be dated since 1840, appear to establish this fact.

The question then arises upon these pleadings and facts, whether there exists in the Court of Chancery of Maryland, authority, during the separation, to make a suitable allowance out of the property of the husband for the maintenance of the wife, or in other words to decree her alimony?

It is a question of great importance and delicacy, and has commanded, as it deserved, a very full and deliberate consideration of the cases upon the subject which have fallen under my observation, or been brought to my attention in the arguments of the counsel by whom the cause has been tried.

The counsel for the defendant has insisted that in England, the Court of Chancery grants alimony, or a separate maintenance for the wife, only, as a consequence of, or as an incident to, a sentence of divorce, a mensa et thoro, and that therefore no such allowance can be made there by the Chancery Court until the proper tribunal shall have paved the way by decreeing a separation between the parties, and this is a proposition which seems to be settled by the cases.

In this state, no judicial tribunal was ever clothed with authority to grant divorces until the legislature, by the act of 1841, ch. 262, conferred jurisdiction in such cases upon the courts of equity, defining the ground upon which they should proceed in the exercise of this new jurisdiction. Up to that period the legislature itself had exercised this power.

But although the Court of Chancery, until the passage of this act, had no authority to decree a divorce, it had from a period prior to the revolution full and complete jurisdiction in cases of alimony, and could decree to the wife a separate maintenance out of the estate of the husband, founded upon a proper case, 2 *Bland,* 565, 566 ; and the cases cited in the notes. *Galwith* vs. *Galwith,* 4 *H. & McH.,* 477 ; *Crane* vs. *Meginnis,* 1 *G. & J.,* 475.

This jurisdiction has also been expressly given to the Court of Chancery by the act passed at the February session, 1777,

ch. 22, sec. 14, which declares, "that the Chancellor shall and
may hear and determine all causes for alimony in as full and
ample manner as such causes could be heard and determined
by the laws of England in the ecclesiastical courts there."

It is said, however, that although the Court of Chancery
may · possibly ·entertain applications for alimony under the
power communicated to it by this act, although a sentence of
divorce, *a mensa et thoro*, may not previously have passed, yet
still no such application can be successful unless upon grounds
which in England would entitle the parties to such a divorce in
the ecclesiastical court there, and such is the opinion of the
late Chancellor as expressed in the case of *Helms* vs. *Francis-
cus*, 2 *Bland*, 568.

And the argument is then pressed, that the case made by
these proceedings would not, according to the doctrine of the
ecclesiastical courts in England, entitle this complainant to a
divorce, *a mensa et thoro*, and that consequently the prayer for
alimony must fail.    The doctrine upon this subject in the eccle-
siastical courts certainly appears to be, that in applications for
a divorce on account of cruelty it is necessary to show, "that
actual violence has been committed, attended with danger, or a
reasonable apprehension of such violence." *Evans* vs. *Evans*,
4 *Eng. Eccl. Rep.*, 310 ;   *Lockwood* vs. *Lockwood*, 7 *ib.*, 115.

It is said, then, that though the Court of Chancery in Mary-
land had not, prior to the act of 1841, jurisdiction in cases of
divorce, and though the authority to determine causes for ali-
mony was expressly delegated to this court by the act of 1777,
that yet in the exercise of this jurisdiction it must be governed
by the principles which regulate the English ecclesiastical courts
in passing sentences of divorce ; that is to say, that no decree
for alimony can be passed by this court, except for causes
which in England would entitle the wife to a divorce, *a mensa
et thoro*, and as the circumstances of this case would not en-
title the present complainant to a decree of separation from
her husband, she cannot have alimony or a separate mainte-
nance.

This argument is founded upon the construction placed by

the defendant's counsel upon the 14th section of the act of February session, 1777, ch. 12, the language of which has been already cited. The Chancellor does not concur in this construction of the law. It gives to the Chancellor power "to hear and determine all causes for alimony in as full and ample manner as such causes could be heard and determined by the laws of England in the ecclesiastical courts there." It therefore gives full and complete jurisdiction over the subject of cases for alimony, but there is nothing in the language employed in the section which necessarily restricts the court to the circumstances and causes which would entitle the party applying for alimony to a divorce according to the ecclesiastical law of England. The Chancellor is to hear and determine causes for alimony as fully, and with as much authority as similar causes are heard in the ecclesiastical courts, but it does not follow that in granting relief he is confined to the same grounds which must be shown in those courts to entitle the wife to a divorce, *a mensa et thoro*. If, indeed, the court can only decree alimony where a similar decree can be obtained in the ecclesiastical courts, or the English chancery, and it can only be obtained there as a consequence of a divorce, *a mensa et thoro*, then no decree for alimony could ever have been passed in Maryland from the passage of the act of 1777 to the act of 1841, unless the legislature had previously divorced the parties. The Chancellor thinks that such cannot be the true construction of the act of 1777. If it is, then, in every bill for alimony it should have been averred to give the court jurisdiction that the legislature had previously separated the parties, and yet it is believed such averment has not been introduced, or considered necessary. It is certain no such averment is to be found in the bill in this case, which has been ruled sufficient upon demurrer.

Supposing, then, that a preliminary act divorcing these parties, *a mensa et thoro*, was not necessary to give the court jurisdiction to decree the wife alimony, the question remains whether the facts which the Chancellor considers established in this case entitle her to that relief? These facts are separation,

commenced and continued by the act of the defendant against the will of the wife, and the refusal or neglect of the former to make provision for her support.

There can be no sort of doubt that it is the duty of the husband to provide a suitable maintenance for his wife, and that if he will not do so some proper remedy should be provided to compel him. It is true that an action may be brought against the husband in a court of common law by any person who may supply the wife with necessaries under such circumstances, according to her rank and condition, but this is at best but a precarious and uncertain reliance, and persons may not be found who are willing to trust the contingencies and delay which may be interposed to prevent recoveries in such cases. It would be far better if some proceeding could be instituted by which the husband shall be compelled to pay alimony, or that the wife shall be restored to her conjugal rights. But in this state there is no tribunal competent to entertain a suit for the restoration of conjugal rights, and hence the only alternative is to leave the wife, in case the husband refuses to provide a suitable maintenance for her, to be supplied by strangers who may be willing to look to the husband for their reimbursement, or to grant her alimony out of his estate.

It has been already remarked that in Maryland a previous decree divorcing the parties, *a mensa et thoro*, is not indispensable to the granting the wife alimony out of the property of the husband. In *Wallingsford* vs. *Wallingsford*, 6 *H. & J.*, 485, the Court of Appeals said, that "alimony is a maintenance afforded to the wife where the husband refuses to give it, or where from his improper conduct he compels her to separate from him," and that it is "a provision for her support to continue during their joint lives, or so long as they live separate." According to the pleadings and proceedings in that case there had been no divorce, and it is nowhere intimated that such was a necessary prerequisite to the allowance of alimony. So far from it the prayer of the petition which asked for alimony, the court say cannot be granted because the record did not show the value of the property of the husband, the *data* by which the amount

of the allowance should be regulated. The decree which was was passed in that case, and which gave relief of a totally different character from that which was asked for, was reversed for the reasons stated, but without prejudice to the rights of the parties. It seems to the Chancellor fair to suppose that if in that case the value of the husband's property had been shown, the Court of Appeals, upon the principles stated by them, would have given the wife alimony though there was no pretence that they had been divorced previously. The Chancellor does not think that there is anything in the case of *Crane* vs. *Meginnis*, 1 *G. & J.*, 463, which is in conflict with his understanding of the previous case of *Wallingsford* vs. *Wallingsford*. The judge in delivering the opinion of the court in *Crane* vs. *Meginnis*, speaking of the doctrine of the ecclesiastical courts in England, says that the allowance of alimony there is treated as a consequence drawn from the divorce, *a mensa et thoro*, but it certainly is not to be inferred from this that he meant to say the Court of Chancery of Maryland could not decree alimony unless the parties had been previously divorced, when no judicial power in the state at that time had authority to pass such a sentence.

Prior to the act of 1841, ch. 262, the act of divorcing man and wife had been performed exclusively by the legislature, and as said by the Court of Appeals in *Crane* vs. *Meginnis*, could be viewed in no other light than the regular exertion of legislative power.

Upon what grounds this department of the government proceeded in this exercise of its authority it would be difficult to ascertain, as the laws passed upon this subject seldom contain a preamble or other statement setting forth the facts which led to their enactment, but it is certainly highly probable that they did not in all cases confine themselves to the causes upon which alone the ecclesiastical courts in England would separate man and wife. It is certain that the act of 1841 conferring jurisdiction upon the equity courts authorizes them to grant divorces both absolute and qualified upon grounds which are not warranted by the canon law of England.

It is not the design of the court at this time to place a construction upon this law, because as the original bill was filed before its passage, he does not think its provisions are applicable to the case made by it, and because neither it nor the supplemental bill prays for a divorce of either kind. The bill prays specifically for alimony, and the question is, whether this court has the power and ought, under these circumstances, decree it to her.

The Chancellor thinks the power exists, and that the facts of the case call imperatively for its exertion. This conclusion though not fortified by any direct Maryland decision upon the point, is not without authority in support of it. In *Rhame* vs. *Rhame*, 1 *McCord's Ch. Rep.*, 197, the Court of Appeals of South Carolina in reversing the decree of the Chancellor, say, at page 207, "that desertion or abandonment of the wife by the husband would be good ground for alimony contrary to the English rule." "That there must be some method by which the husband may be compelled to maintain his wife, and when restitution of conjugal rights cannot be decreed, alimony must."

My impression is, that this is the true rule, and I shall decree accordingly, but the proof in the record in regard to the value of the estate of the husband is not so clear as to enable me to determine satisfactorily the amount of the allowance to be made to the wife, and the case will, therefore, be sent to the Auditor to make a report upon the subject from the proofs already taken and such further evidence as the parties may lay before him. The propriety of referring the question to the Auditor under the circumstances of this case, is stated by Chancellor Kent in *Barrere* vs. *Barrere*, 4 *Johns. Ch. Rep.*, 198.

——

[An order was then passed directing the Auditor to state the value of defendant's property at the present time, and also at the time of filing the bill, in accordance with the above opinion. After this report was made by the Auditor, but before the Chancellor acted upon it, the defendant died, and by consent of his executor and the complainant, a decree was passed directing the executor to pay complainant all her costs and expenses,

including counsel fees to the amount of $300, and dismissing the bill.]

WM. J. WARD and CHAS. F. MAYER, for Complainant.
R. W. GILL, for Defendant.