# CARLOS B. THOMAS *v.* IDA M. THOMAS

[No. 895, September Term, 1980.]

*Decided March 11, 1981.*

256

The cause was argued before MASON, LISS and WILNER, JJ.

*H. Michael Rankin* for appellant.

*Theodore L. Mast,* with whom were *Stephen H. Kiefert, Joseph F. Gaffigan, Bill L. Yoho* and *Robert S. Hoyert* on the brief, for appellee.

WILNER, J., delivered the opinion of the Court.

We are presented here, for the first time, with a most interesting aspect of the law of divorce and alimony, one that involves not only the interpretation of a century-old statute but the even more ancient and arcane tenets of English ecclesiastical law as they have filtered down to us through the Maryland common law. What is the effect of a reconciliation and subsequent parting of the ways upon an award of alimony arising from a decree of divorce *a mensa et thoro*?

Appellant commenced this proceeding on February 10, 1977, with the filing of a Bill in the Circuit Court for Prince George's County seeking a divorce *a mensa et thoro* from appellee. That action was docketed as DR 77-463. Acknowledging himself to be a citizen of Trinidad, but a permanent resident of the United States and a legal resident of Prince George's County, he averred that appellee had, without just cause, deserted him and the marital abode on September 18, 1976. In addition to the divorce, he sought custody of the two adopted minor children of the parties who, at the time, were residing with him.

Appellee answered this Bill on June 23, 1977, denying the accusatory allegations and asserting that she then had custody of the children. It appears that, also on June 23, appellant returned to Trinidad, having accepted employment there; and at some point appellee moved back into the

marital home. On July 7, 1977, appellee filed, in the same case, a cross-bill for divorce *a mensa et thoro,* or, in the alternative, for divorce *a vinculo matrimonii,* claiming desertion, cruelty, and adultery on appellant's part. The allegation as to desertion was that appellant unjustly abandoned her on February 25, 1977.

According to the certificate of service appended to it, a copy of the cross-bill was delivered to appellant's counsel, and, when no answer to it was forthcoming within the 15 days allowed by law, appellee, on July 26, 1977, moved for a decree *pro confesso.* On August 4, 1977, such a decree was entered, and the matter was referred to the Domestic Relations Master to take testimony in support of the cross-bill.

On September 8, 1977, the master conducted a hearing on the cross-bill. Appellant, of course, was not present, and indeed claims that he had no knowledge either of the decree *pro confesso* or the proceeding before the master. Based upon the evidence presented at the hearing, the master recommended, and on September 22, 1977, the court entered, a decree of divorce *a mensa et thoro* grounded upon appellant's desertion occurring February 25, 1977. The decree also awarded custody of the children to appellee, ordered appellant to pay to appellee the sum of $600 a month child support and $600 a month alimony, both accounting from September 8, 1977, and ordered him to contribute $1,800 toward appellee's counsel fees.

Appellant, still in Trinidad, remained blissfully unaware of all this. He returned to the United States on December 4, 1977, and, believing all prior proceedings to have been dismissed, resumed cohabitation with his legally estranged wife and his children at the marital abode. Unfortunately, this was to be but a temporary reunion. On December 30, 1977, appellee, for reasons not appearing in the record, set fire to the marital home, forcing the family to seek other quarters.[1] They remained together, nevertheless, until

---

1. Appellee was subsequently convicted of arson as a result of that incident and placed on probation.

March 17, 1978, when appellant left, taking the children with him.

Twelve days later — on March 29 — appellant, still unaware of the September decree, filed a new bill for divorce *a mensa et thoro* (docketed as DR 78-1149), charging appellee with cruelty and constructive desertion as of March 17, 1978. He averred general conduct on her part that was violent, humiliating, and degrading to him, and specifically mentioned her burning of the marital home and her physical abuse of the children, all of which made the marriage intolerable and forced him (and the children) to leave.

Appellee responded with an answer denying the accusatory allegations and claiming, in a plea of *res judicata,* that all issues in the action had already been decided by the decree rendered on her cross-bill in the earlier action. She responded also with a petition filed in the other case (DR 77-463) to hold appellant in contempt of court for failing to pay the alimony and child support ordered in the September decree. It was these pleadings that first actually apprised appellant of the subsisting divorce and his obligation for spousal and child support.

Appellee's contempt petition in DR 77-463 came before the master on July 7, 1978. At that hearing, appellant filed a written petition to modify the September, 1977, decree, asserting therein (1) that he was unaware that the decree had been passed, (2) that subsequent to the decree the parties had reconciled, and (3) that he adopted "the statements of fact contained in his Bill of Complaint filed in Equity No. DR 78-1149," which he prayed be incorporated by reference. He asked in his petition for custody of the children and a striking of all sums "previously awarded for child support, alimony, and attorney fees...."

We are told that, because appellee had no opportunity to answer this petition, it was not considered at that time by the master. Upon the evidence presented, however, the master concluded that (1) by stipulation of the parties, appellant should have custody of the children, (2) appellant not be adjudicated in contempt of court, and (3) "the arrears in child

support and alimony be assessed at zero" as of July 7, 1978. This last recommendation arose from the master's finding (1) that when appellant went to Trinidad, he left $10,000 in a joint bank account, one-half of which was his, and that appellee spent the full amount for the support of herself and the children, and (2) that "by reconciling, [appellant's] obligation to pay child support and alimony to [appellee] terminated."

Appellee excepted to the recommendation as to arrearage, asserting that the master erred in concluding that "the parties' temporary reconciliation rendered this Courts' [sic] decree a nullity . . ." and in recommending that no arrearage in alimony be assessed. She asked that the court enforce the provision in the decree for alimony and remand the matter back to the master to assess alimony arrearages based upon the validity of the subsisting decree.

On December 7, 1978, the court filed an opinion and order agreeing in part and disagreeing in part with what the master had done. It agreed that the obligation for alimony had terminated, or been suspended, during the period of the reconciliation, but not before and not after. There was little dispute as to the accrual of alimony during the three-month period prior to the reconciliation; appellant's only defense as to that was that the $3,600 accrual for that period was offset by his share of the bank account expended by appellee. As to the reconciliation period itself, the court seemed to draw upon two theories: first, that, as a matter of law, alimony actually ceases during such a period; and, second, that a reconciliation constitutes "a substantial change in circumstances justifying modification." Neither theory, however, was applied to the period following the second break-up in March, 1978. As to that, the court concluded that a "reconciliation alone is not a sufficient change in circumstance to permit modification of the original decree so that no future alimony was required of [appellant]."

Upon this analysis, the court found an arrearage of alimony and child support for the pre-reconciliation period of $3,600, no arrearage for the period of reconciliation, and an alimony arrearage of $2,200 for the nearly four-month

period between the second separation and the master's hearing. This total of $5,800 exceeded appellant's $5,000 share of the bank account. The court thereupon remanded the case to the master "for further hearing and assessment of alimony arrearages, in accordance with this opinion."

On remand, the master held another evidentiary hearing and considered the matters at issue as of then (December 21, 1978). In his second report, he first noted his disagreement with the court's conclusion that alimony did not terminate by reason of the reconciliation; but he proceeded nevertheless in accordance with that determination. As to the period preceding the reconciliation, he found a gross arrearage of $3,400 ($1,700 alimony and $1,700 child support).[2] Against that he applied appellant's $5,000 share of the bank account, $2,500 of which he allocated to alimony and $2,500 to child support. That left an $800 credit, as to each, in appellant's favor.

"Assuming, without finding, that [appellee] is entitled to alimony after the 17th day of March, 1978," the master found an accrual of alimony in the amount of $5,480 for that period ($600 a month for the nine months, four days to the date of the second hearing). Deducting the $800 credit left over from the bank account, he found a net accrual of $4,680. Finding, however, that appellant was fully justified in leaving the home in March by reason of appellee's conduct (which he concluded amounted to a constructive desertion), the master recommended that no arrearage be assessed and that the decree be amended to terminate alimony payments from and after March 17, 1978.

Once again appellee filed exceptions, contending, among other things, that the master erred in finding a constructive desertion by appellee and that he erred as well in recommending that no arrearage be assessed. Once again, the court agreed. It concluded that, as the case had been remanded to the master solely to calculate an arrearage, the master exceeded the scope of his authority in concluding

---

**2.** The master arrived at the $3,400 figure, in contrast to the court's calculation of $3,600 by using a period of two months, twenty-five days rather than a full three months.

that appellee was guilty of a constructive desertion and that he therefore erred in considering such desertion as a basis for recommending no assessment of arrearage. Accordingly, although the court accepted the master's mathematics, it rejected his recommendation, and, on May 29, 1980, decreed an arrearage of $4,680.

In this appeal, appellant claims that the court erred in both its conclusions. He asserts that the issue of appellee's conduct, as raised in his petition to modify the original decree, was properly before the master, and that as a matter of law the reconciliation served to terminate his obligation for alimony. Because we agree with his latter contention, we shall find it unnecessary to consider the former.

As has been pointed out on a number of occasions, although our law of divorce and alimony was generally derived from the English experience, it did not come to us through the English common law. *See Kapneck v. Kapneck,* 31 Md. App. 410 (1976), *cert. den.* 278 Md. 739. The English practice was described by the Court of Appeals in *Courson v. Courson,* 213 Md. 183, 185 (1957):

"From the time of *Foliamb's* case (44 Eliz.), 3 Salk. 138, (about 1602) until the divorce act of 20 and 21 Vict. ch. 85 (about 1857), no absolute divorce could be judicially granted in England. The only legal separation recognized was a divorce from bed and board upon a decree of the Ecclesiastical Court. These Courts, as an incident to the decree, granted alimony, temporary or permanent, but only as a part of the decree *a mensa et thoro.* Alimony, therefore, under the English law had no independent existence, and no Court, not even the Ecclesiastical, could grant alimony when it was the only relief sought."

As the Court further pointed out in *Courson,* the Maryland practice was patterned only partly upon the English. Until 1841, the granting of an absolute divorce remained exclusively a legislative prerogative and was

effected by Act of the General Assembly.[3] Because there were no ecclesiastical courts here, however, jurisdiction over actions for divorce *a mensa et thoro* and attendant claims for alimony was assumed by the High Court of Chancery. *See Crane v. Meginnis,* 1 G. & J. 463, 473 *et seq.* (1829). In point of fact, however, the chancery court actually assumed a somewhat broader jurisdiction than that reposed in the English ecclesiastical courts.

As noted in *Courson* and in *Emerson v. Emerson,* 120 Md. 584 (1913), the ecclesiastical courts awarded alimony only as part of a decree of divorce *a mensa et thoro*; there was no separate action permitted just for alimony. *See* 2 *Bishop on Marriage and Divorce,* §§ 351, 352 (4th ed. 1864). Yet it appears that from a very early time, the Maryland chancery court presupposed and occasionally exercised the authority to award alimony where no divorce was granted, and indeed where an *a mensa* divorce was not even sought. *See, for example, Lynthecumb's Case* (1738), *Scott's Case* (1747), and *Govane's Case* (1752) noted in *Helms v. Franciscus,* 2 Bland. 544, 565 *et seq.,* note (f) (1830); *also Hewitt v. Hewitt,* 1 Bland. 100 (1826); *Jamison v. Jamison,* 4 Md. Ch. 289 (1847); *Galwith v. Galwith* (1689), reported in 4 H. & McH. 477. The precise authority for such a practice, at least in Provincial times, was questionable, as it cannot be said to have emanated from the ecclesiastical law or practice. It appears that the authority was simply assumed as part of inherent chancery jurisdiction. As the Court observed in *Stewart v. Stewart,* 105 Md. 297, 300 (1907):

"From a period before the Revolution . . . the Court of Chancery in this State had full jurisdiction in cases of alimony though no divorce had been decreed or was asked for, and though the case made by the bill and proof, would not, according to the Ecclesiastical Courts in England, entitle her to *a divorce a mensa et thoro.*"

---

**3.** The Legislature retained a concurrent power to grant an *a vinculo* divorce until the power was withdrawn by our present Constitution, adopted in 1867. *See* art. III, § 33.

*See also* 2 Bishop, §§ 355, 356; *Taylor v. Taylor,* 108 Md. 129 (1908).

By Acts of 1777, ch. 12, an Act generally regulating marriage, the General Assembly confirmed the authority of the chancery courts over actions for alimony; but it did so in a curious way. Section 14 of that Act empowered the chancellor to hear and determine "all causes for alimony, in as full and ample manner as such causes could be heard and determined by the laws of England in the ecclesiastical courts there." This law, with but occasional changes in style, remains on the books as Courts article, § 3-603, and governs this case in its present posture.[4] It is arguable, of course, that by describing the chancellor's jurisdiction over alimony requests in the context of the ecclesiastical practice, the Legislature intended to restrict that jurisdiction to cases where an *a mensa* decree was awarded; but the statute was not interpreted in that manner. Instead, it has been viewed as merely putting the legislative *imprimatur* on the practice theretofore followed by the chancery court. *See Jamison v. Jamison, supra,* 4 Md. Ch. 289; *Wallingsford v. Wallingsford,* 6 H. & J. 485, 488 (1825); *Wright v. Wright,* 2 Md. 429, 450 (1852); *Dunnock v. Dunnock,* 3 Md. Ch. 140, 143 (1852). *Cf. Crane v. Meginnis, supra,* 1 G. & J. 463.

By Acts of 1841, ch. 262, the General Assembly first conferred statutory jurisdiction over *divorce* actions on the equity courts. The Act set forth the grounds cognizable for *a vinculo* and *a mensa* divorces, confirmed the preexisting authority of equity over the latter, and, for the first time, expanded that authority to include the former. Section 3 provided that "in all cases where a divorce is decreed, the

---

4. The statute formerly was codified as Md. Ann. Code (1957) art. 16, § 2. With the enactment of the Courts article by Acts of 1973 (1st Spec. Sess.), ch. 2, as part of the code revision process, art. 16, § 2 was repealed and its provisions transferred, without substantial change, to the new article as § 3-603. Section 2 of art. 16 thereafter remained repealed and vacant, not replaced with any new enactment. By Acts of 1980, ch. 575, the General Assembly enacted a comprehensive new alimony law. Section 1 of that Act purported to repeal § 2 of art. 16, which, as noted, had already been transferred to the Courts article; but it made no mention, in the repealer, of Courts article, § 3-603. It is not clear to us, from this, what the legislative intent was in terms of those provisions formerly codified as § 2 of art. 16 and now codified as § 3-603, Courts article.

court passing the same shall have full power to award alimony to the wife. . . ."

The effect of that last provision was, for a time, uncertain. In *Dunnock v. Dunnock, supra,* 3 Md. Ch. 140, Chancellor Johnson concluded that it did not change the ability of the equity court to award alimony independent of a divorce; and in *Jamison v. Jamison, supra,* 4 Md. Ch. 289, he seemed to conclude that alimony could be granted even if *grounds* for a divorce were not shown. The Court of Appeals made clear that that was not the case, however, in *Outlaw v. Outlaw,* 118 Md. 498 (1912). It there adopted the principle laid down by Chancellor Bland in *Helms v. Franciscus, supra,* 2 Bland. 544, that the court "can not allow itself to receive any matter as a sufficient ground for granting alimony alone, which would not be a sufficient foundation in England for granting a divorce *a mensa et thoro* together with its incident alimony. . . ." *See* 118 Md. at 503; [5] *also Hood v. Hood,* 138 Md. 355 (1921); *Walker v. Walker,* 125 Md. 649 (1915).

It thus appears that, although after 1841 the jurisdiction of the equity courts over divorce and alimony was a statutory one, it still remained tied in certain material respects to the English ecclesiastical practice. The rule was expressed thusly in *Emerson v. Emerson, supra,* 120 Md. at 590:

> "Our understanding of alimony and its incidents has been borrowed from the decisions of the Ecclesiastical Courts, and this Court has, on several occasions, said that in divorce cases the Courts of Equity of this State do not sit in the exercise of their general equitable jurisdiction, but as a Divorce Court, and are governed by the rules and principles established in the Ecclesiastical Courts of England, *so far as they are consistent with the Code.*" (Emphasis supplied.)

We turn, then, at least initially, back to the ecclesiastical law which, as we have noted, permitted alimony only as an

---

**5.** Actually, in subsequent language, the Court made clear that alimony could be awarded if the petitioner proved any ground for an *a mensa* divorce under the Maryland statute. She was not, in other words, restricted to grounds cognizable under the ecclesiastical law.

incident to an *a mensa* divorce. The nature of an *a mensa* decree, under ecclesiastical law, was that it merely authorized the parties to live apart from one another; but once they chose not to do so, it had no further effect. A reconciliation, in other words, "of its own force, annul[led] the sentence of separation." Bishop, *supra,* § 729; *also* Poynter, *Doctrine and Practice of the Ecclesiastical Courts in Doctors' Commons on Various Points Relative to the Subject of Marriage and Divorce,* p. 182 (2nd ed. 1836). This, indeed, was evident from the very form of the *a mensa* decree issued by the ecclesiastical courts, which expressly provided for a termination upon reconciliation.[6] Thus, at ecclesiastical law, as the alimony emanated solely from the divorce, it too would automatically terminate upon a reconciliation.

The Maryland courts followed that practice. The early alimony decrees issued by the equity courts also expressly provided that the obligation would cease upon a reconciliation,[7] and, more important, in *Wallingsford v. Wallingsford, supra,* 6 H. & J. 485, the Court of Appeals imposed that condition as part of its very definition of alimony. In an oft-quoted statement, it said, at p. 488:

"Alimony is a maintenance afforded to the wife, where the husband refuses to give it, or where from his improper conduct compels her to separate from

---

**6.** *"In omni sententia lata inseritur haec clausula, Dictos N. et M. ratione saevitiae allegatae et probatae, a thoro, mensa, et mutua cohabitatione, absque obsequiorum conjugalium impensione, donec et quosque duxerint invicem reconciliandos, et non aliter, neque alio modo, separamus."* Oughton's *Ordo Judiciorum,* tit. 215, s. 3, quoted in *Barrere v. Barrere,* 4 John. Ch. 187 (N.Y. 1819) (Opinion by Chancellor Kent). *See also* Poynter, p. 182, note (1).

**7.** *See, for example,* the orders accompanying the decisions digested in *Helms v. Franciscus, supra,* 2 Bland. at 565-574, notes (e) and (f), *e.g., Scott's Case* (1747): "Decreed, that the defendant pay unto the complainant thirty pounds current money yearly and every year, from the 20th day of August, 1746, during the joint lives of both parties, *unless they shall be reconciled, and mutually agree to cohabit together; and in case of such reconciliation and cohabitation, the said payment to cease. . . ."* (Emphasis supplied.) This form of decree was still being used at least as late as 1839. *See Mincher v. Mincher,* Chancery Papers #9642 (petition 1837, decree 1839).

him. It is not a portion of his real estate, to be assigned to her in fee simple, subject to her control, or to be sold at her pleasure, but a provision for her support, to continue during their joint lives, *or so long as they live separate.* Upon the death of either, *or upon their mutual consent to live together, it ceases. . . .*" (Emphasis supplied.)

This statement from *Wallingsford* has a significance not entirely and immediately apparent from the mere wording of it. Ecclesiastical alimony terminated upon a reconciliation because it was inextricably tied to the *a mensa* divorce from which it necessarily emanated, and that divorce terminated upon reconciliation. But that was not the condition in Maryland and never had been; and indeed *Wallingsford* itself involved a petition for alimony alone. Thus, although at the time an *a mensa* decree would still itself terminate by virtue of a reconciliation, as it did under ecclesiastical practice, the *Wallingsford* Court appeared to make that also a condition of alimony, *whether or not it arose from a divorce.*

That became important when, by Acts of 1872, ch. 272, the General Assembly provided that an *a mensa* decree "may be revoked at any time thereafter by the court granting the same, *upon the joint application of the parties to be discharged from the operation of the decree. . . .*" (Emphasis supplied.) Although not entirely clear from the wording of the statute itself, the history of that Act points rather forcefully to the conclusion that the Legislature meant by it to provide an *exclusive* means of terminating a subsisting *a mensa* decree, and thus to preclude an automatic termination by virtue of a reconciliation.[8] Similar Acts have been so

---

8. The ultimate origin of statutes such as ch. 272 may have been the decision (or, more directly, the reasoning) of Chancellor Kent in *Barrere v. Barrere, supra,* 4 John. Ch. 187. In contrast to the ecclesiastical practice, a New York statute permitted the court "to decree a separation from bed and board, forever thereafter, or for a limited time, as shall seem just and reasonable, or to make such other decree in the premises as the nature and circumstances of the case require." Kent thus had a great deal of flexibility in fashioning a decree.

He concluded that an *a mensa* decree ought not to be forever, for it should be left open to the parties to reconcile should they choose to do so. But he

interpreted almost uniformly. *See, for example, Nelson on Divorce and Annulment* (2nd ed. 1945), § 28.26; Annot., *Reconciliation — What Comprises — Effect,* 35 A.L.R.2d 707, 741, *et seq.; also* Annot., *Court's Power to Vacate Decree of Divorce or Separation Upon Request of Both Parties,* 3 A.L.R.3d 1216. Indeed, the statute would be virtually meaningless if the rule were otherwise.

The question then arises as to what effect, if any, the 1872 statute has on an award of alimony emanating from an *a mensa* decree. If (assuming that the statute creates an exclusive means of annulling the decree of divorce) a reconciliation does not, of itself, serve to annul the underlying decree, does it serve, nevertheless, to terminate the alimony awarded as part of the divorce?

As we have noted, the Court of Appeals in *Wallingsford* made clear that alimony ceases upon reconciliation; and although much water has passed under the bridge since *Wallingsford,* including the enactment of the 1872 statute, the Court has never departed from that premise. Indeed, it has often reaffirmed it. The clearest expression of this was in *McCaddin v. McCaddin,* 116 Md. 567 (1911). At issue there, among other things, was the validity of a decree that awarded permanent alimony as of a certain date but con-

---

rejected as well the notion of automatic termination upon reconciliation, observing that such an event (and thus the continuing vitality of the decree itself) was open to dispute. Kent stated his preference for a decree that remained in effect "until the parties shall have applied to the Court, and received, upon just grounds, a judicial recognition of the certainty and sincerity of their reconciliation." This reasoning led Kent, and apparently the chancellors who succeeded him, to fashion their *a mensa* decrees accordingly and thus to preclude a reconciliation from automatically nullifying the decree. In 1828, the New York legislature adopted Kent's rationale and made the practice a matter of statutory law. *See* 2 N.Y. Rev. Stat., p. 147, § 56, now CLS, Domestic Relations Law, § 203; *also see Hobby v. Hobby,* 39 N.Y.S. 36, 38 (App. Div. 1896), and *Jones v. Jones,* 35 N.Y.S. 877 (Sup. Ct. 1895), indicating that the statute merely adopted the rule laid down by Kent.

Kent's reasoning, embodied in the New York statute, eventually spread to other States, which began to adopt similar statutes. *See, for example,* 1846 Mich. (ch. 84, § 43); 1849 W. Va. (prior to Statehood), ch. 169; 1854 Ky. (*see Dunn v. Dunn,* 257 S.W.2d 283, 285, n. 2 (Ark. 1953); *also Meyar v. Meyar,* 60 Ky. (3 Metc.) 298 (Ky. 1860)); 1861 Va. (ch. 18, pp. 41, 42; Va. Code (1873) Title 31, ch. 105, § 15, p. 853); 1869 Ark. (*Dunn, supra,* 257 S.W.2d 283). In 1872, Maryland joined the ranks, the statute now appearing as part of Md. Ann. Code art. 16, § 25.

tained no limitation on its duration. The Court sustained the decree, reading into it the limitations enunciated in *Wallingsford.* The Court said, at p. 573:

> "When, therefore, this decree provided for the payment of so much a week as permanent alimony, it was subject to the limitations fixed by law, and could only continue during the joint lives of the husband and wife, *while they live apart.* There has been some diversity of opinion between the Courts of different jurisdictions as to how far a final decree, allowing permanent alimony, can be modified after the decree has become enrolled, but in this case there can be no difficulty. These parties have not been divorced, either *a mensa et thoro or a vinculo matrimonii,* but, being separated under such circumstances as to require the husband to support the wife, provision for her support is made, *but only while they are so separated....*" (Emphasis supplied.)

The Court then indicated that the situation would be no different had an *a mensa* divorce been granted. Quoting in part from 2 Am. & Eng. Ency. of Law, p. 140, the Court held, at p. 574:

> " 'In reason, if the wife returns to her husband after a divorce *a mensa et thoro,* and is reconciled to him, she cannot continue to have alimony.' That being so when there is a divorce *a mensa et thoro, a fortiori* it would be so when there is no divorce.
>
> "It seems, therefore, to be well settled that at least when a divorce *a mensa et thoro* is granted, or when there is an allowance of alimony without divorce, the decree can be modified as circumstances may require, subject, of course, to some well established rules, *and in this State alimony ceases upon the death of either party, or upon their living together.*" (Emphasis supplied.)

*See also Emerson v. Emerson, supra,* 120 Md. 584, 590; *Bart v. Bart,* 182 Md. 477, 479 (1943); *Dickey v. Dickey,* 154 Md. 675 (1928); *Foote v. Foote,* 190 Md. 171 (1948); *Courson v. Courson, supra,* 213 Md. 183; *Altman v. Altman,* 282 Md. 483, 490 (1978).

These expressions — this uninterrupted adherence to the *Wallingsford* definition — make clear at least two things: (1) that the alimony award, even if emanating from or included as part of a decree of divorce *a mensa et thoro,* is not inextricably tied to that decree for its continuing validity, and (2) that although a reconciliation does not serve to terminate the *a mensa* decree, as that can be done only by court order upon joint application of the parties, it does serve to terminate the alimony, without regard to whether it arises from the divorce decree. The ultimate question, of course, is whether the alimony automatically revives upon a subsequent separation: does the alimony actually cease upon the reconciliation or is it placed in some form of suspended animation?

Other States (and one Canadian province), in the few instances where the question has arisen, have taken differing views. *See, for example, Hester v. Hester,* 79 S.E.2d 248 (N.C. 1953), *O'Hara v. O'Hara,* 266 S.E.2d 59 (N.C. App. 1980), *Lund v. Lund,* 315 P.2d 856 (Utah 1957), and *Patterson v. Patterson,* 4 DLR 793 (Ontario S.C. 1928), suggesting that the support order is not revived, and *Justice v. Justice,* 108 N.E.2d 874 (Ohio Comm. Pl. 1952), *Atkinson v. Atkinson,* 170 So. 198 (Ala. 1936), and *McIlroy v. McIlroy,* 94 N.E. 696 (Mass. 1911), expressing the view that it does revive. *See also Hawn v. Hawn,* 505 S.W.2d 459 (Mo. App. 1974); Nelson, *supra,* § 32.45; Bishop, *supra,* § 428.

Different reasons and theories have been advanced. The New York courts, for example, which have never followed the ecclesiastical law, appear to treat the alimony as an inextricable part of the *a mensa* decree, and have concluded that, since the underlying decree remains in effect until terminated by the court, the alimony does likewise. *See Jones v. Jones,* 35 N.Y.S. 877 (Sup. Ct. 1895); *Schatzberg v. Schatzberg,* 241 N.Y.S. 684 (App. Div. 1930); *Rozycki v.*

*Rozycki,* 102 N.Y.S.2d 217 (Sup. Ct. 1951). The North Carolina Court reached an opposite conclusion, but for the same reason. In that State, the underlying divorce terminates upon reconciliation and with it the alimony. *Hester v. Hester, supra,* 79 S.E.2d 248. "[I]f there is a subsequent separation and need for subsistence for the wife," said the Court at p. 251, "the courts are open for whatever relief may be justified by the situation then existing."

The Ohio *nisi prius* court in *Justice v. Justice, supra,* propounded the theory that the policy of the law is to encourage reconciliation, and that a rule which would automatically terminate an *a mensa* decree, or alimony awarded by it, upon a reconciliation would tend to discourage such reunions. "Foolish indeed," it said, "would be the woman with minor children who would take such a gamble with her declared rights under a decree. Should such a reconciliation fail, through no serious fault of either party, that woman would then be forced to commence new proceedings for alimony and support and incur additional expense that goes with such proceeding. A rule of law which would discourage reconciliation or encourage a scheming party to attempt reconciliation solely to escape the decree of the Court, would be unwise indeed. . . ." 108 N.E.2d at 876.

By way of contrast, the Utah court suggested in *Lund v. Lund, supra,* that once the parties decided to reconcile, they would have more of an incentive to remain together if one could not hold a decree "over the head of the other and demand that the line be toed." 315 P.2d at 858.

None of those cases, of course, are binding precedent on us, and each has a distinguishing feature of one kind or another in any event. We cite them only to consider their rationale.

The fact is that, in contrast to the New York and North Carolina law, alimony in Maryland is not inextricably tied to the *a mensa* divorce. It has been separately defined and has a life of its own. Neither is it controlled by the 1872 statute, which makes no mention of alimony, for it has long been established, beyond cavil, that alimony may be modified (or even terminated) upon the petition of either

party alone. Moreover, the considerations involved in deciding upon a modification are not necessarily those which may warrant dissolution of the divorce decree.

There may be some merit to the concern expressed by the Ohio court in *Justice* — that the potential loss of alimony may cause its recipient to think twice and hard about entering into a reconciliation. But perhaps that is not entirely inappropriate. What the law seeks to encourage is a true reconciliation based upon a genuine commitment on the part of both parties, not a resumed cohabitation prompted by the thought that one has nothing to lose by it. A reunion prompted by fraud, or the absence of good faith, solely in order to evade the payment of alimony is not a true reconciliation and would not be regarded as having any legal significance. *See Beale v. Avery,* 178 N.E. 543 (Mass. 1931). The scheming payor, therefore, would have little to gain by his scheme.

Our concern, however, is somewhat more technical. We think that it would be artificial, at best, to resume alimony following the failure of a legitimate reconciliation, automatically and at the decretal rate established perhaps under wholly different circumstances, without regard to the current circumstances of either party, without regard to the length of the reconciliation or the cause of its failure, and as though the reconciliation had never occurred.

The Court of Appeals has said that alimony "ceases" upon a reconciliation. Only it can tell us what it meant by that, but we think that, in its ordinary signification, "cease" means "to end; to stop; to discontinue" (Webster's New Twentieth Century Dictionary, Unabridged), and not to "suspend."

Accordingly, we conclude that once alimony ceases upon a *bona fide* reconciliation, it does not automatically revive upon a subsequent separation, and that the chancellor erred in his finding to the contrary.

We therefore shall reverse his order assessing an arrearage, which, as he calculated it, was attributable solely

to the period following the reconciliation. Under the facts evident in this record, the only valid accrual was for the prereconciliation period and that was fully offset by appellant's share of the bank account. We adopt the aforequoted statement of the North Carolina Court in *Hester v. Hester, supra*: "[I]f there is a subsequent separation and need for subsistence . . . the courts are open for whatever relief may be justified by the situation then existing." In doing so, however, we express no opinion as to this appellee's right (if any) to a restoration of alimony based upon the separation of March, 1978, and the current financial circumstances of the parties.

*Judgment reversed; appellee to pay the costs.*