An order of alimony upon a divorce *a mensa et thoro*, continues in force only until the reconciliation of the parties. If therefore the wife returns at the solicitation of the husband, and cohabits with him but for five weeks, and then leaves him without just cause, she loses her right to alimony.

*Qu.* Whether the court would revive the order, and compel the payment of arrears, if after such a reconciliation the wife was turned out of doors by the husband, or compelled by his treatment to withdraw.

## TIFFIN *against* TIFFIN.

THE plaintiff and defendant were divorced *a mensa et thoro* at *December* term 1802; and in *September* following, this court, pursuant to an agreement between the parties, decreed that the defendant should pay to the wife three hundred dollars per annum in equal monthly payments, transfer to her some personal property, and execute a conveyance to trustees for her use, of an estate in *New Jersey* worth about twelve thousand dollars, which she had brought him in marriage; the whole to be in full of all claim of alimony and dower. And in case the payments should be delayed three weeks after the time appointed, an attachment might issue to enforce the decree, without the necessity of applying to the court.

The transfers and conveyance were duly made; but upon the affidavit of the wife on the 12th *January* 1807, that three hundred and twenty-five dollars were due for arrears of alimony, an attachment issued; and at *March* term following, *Rawle* for the defendant obtained a rule to shew cause why the attachment should not be quashed, upon the ground of a reconciliation prior to the attachment.

The rule being now called up for argument, the defendant,

to prove the fact of reconciliation, read depositions to the following effect:

*Henry Ward* deposed that *Martha Tiffin*, after having been separated some time from her husband, came and resided with him at his house in *Philadelphia* about the 6th of *September* 1806; that they lived together in apparent harmony and mutual good will, until some time in *October*, when the husband became involved in difficulties, and executions were laid upon his furniture; and that in about a week or ten days afterwards she left his house, where he nevertheless continued to reside for several months, when he sailed for the *West Indies*. The witness, who lived in the same house the greater part of the time, was present at several disputes and violent quarrels between husband and wife, in one of which she appeared to have been indulging in drink more than was proper; but after their quarrels they retired at night as man and wife. *Tiffin's* affairs were in a desperate situation when the wife returned; and at the time when the executions were levied, she said she would advance something out of her own money to discharge them, if the witness would advance a part; but upon inquiry into his affairs, she said he was more involved than she expected, and nothing was done. The furniture was then sold under the execution, and bought by the witness, who took possession of the house, and permitted every thing to remain in it until *Tiffin* went to the *West Indies*; but upon Mrs. *Tiffin's* return, after having been absent sometime, the witness ordered her to leave the house.

*John B. Pons* deposed that at Mr. *Tiffin's* solicitation, Mrs. *Tiffin* left her house in *New Jersey* and came to reside with her husband, in *September* 1806; that he worked in Mr. *Tiffin's* shop, and saw Mrs. *Tiffin* almost every hour of the day, managing and directing as a mistress, and appearing to agree well with her husband, until a short time after the 14th of *October*, when an execution was levied, and she left the house.

It appeared by the record that *Lee*, who was security for *Tiffin* upon the attachment, was plaintiff in one of the executions levied on his furniture and goods.

*Sergeant* and *Rawle* for the defendant, contended that by the ninth section of the act of 19th *September* 1785, 2 *St.*

*Laws* 384, the decree of the court; both as to divorce and alimony, was vacated by the reconciliation, and that no subsequent separation could revive it. The jurisdiction of the court under that section depends upon an actual separation occasioned by the husband; he must either maliciously abandon his family, or turn his wife out of doors, or by cruel and barbarous treatment force her to withdraw from his house. In such a case the court may decree either divorce and alimony, or one of them alone; but when both are decreed, the alimony is incident to the divorce, the decree being entire. Whether one or both be decreed, as the foundation of the decree is an actual separation, so by the terms of the section it continues in force only until a reconciliation takes place; and then, as the divorce is *ipso facto* at an end by mutual consent, the right to alimony *thereafter* falls with the divorce to which it is incident, and the right to the *arrears* falls in consequence of the revival of the husband's marital rights, like a bond given by a man to a woman who afterwards marry. There is no such thing as a *suspension* of the decree, where the parties are voluntarily reconciled out of court. The law provides for a suspension; but it is only where the husband by petition or libel in court, offers to receive his wife again, and treat her properly; and then if he fails to perform his offers, the court may order the decree to be revived, and the arrears of alimony to be paid. This suspension is therefore directed only for the protection of the wife, where the court are petitioned to order her return against her will; but where she voluntarily returns, she agrees to reinstate her husband in all his rights, and the decree is extinguished. Granting however that a reconciliation merely suspends the decree, still the court will not order it to be revived, without a new application by the wife, and sufficient cause shewn. Here was a fair *bona fide* reconciliation; and although there were quarrels and disputes, the wife was a more active party in them than the husband. There was nothing like cruel treatment to force her from the house, but she left it in consequence of the executions, which the husband could not prevent. The court will never revive the decree except for the same causes which originally produced it.

*Milnor* and *Heatly contra*, argued that a reconciliation did not by the ninth section mean recohabitation, but a formal reunion of the parties under the sanction of the court. To construe it in any other way, would be to expose the wife to the entire loss of her alimony, upon cohabiting with her husband for a day. If the application of the husband came to the court, and the wife expressed her consent to return, the decree would be suspended to ascertain the sincerity of the husband's promises; and this is the only course consistent with the security of the wife, who, after the decree, is peculiarly under the protection of the court. But if there is such a thing within the meaning of the law as reconciliation out of court, it did not occur in this case, for two reasons: First, because there was merely an attempt at reconciliation which did not succeed. It was a trial, which, as it failed, had no effect upon the decree. Secondly, it was a trick on the part of the husband, either to get possession of her property, or to defraud her out of her alimony. She returned at his solicitation. The same treatment which led to the divorce, was renewed; and when one of the objects of the return was thought to be attained, the execution was devised to force her from the house. It was levied at the suit of the defendant's friend, who is now his security upon the attachment; and the furniture was bought by an inmate in his house, who would not permit Mrs. *Tiffin* to return after the short absence produced by the execution. The whole proceeding was a fraud; and therefore none of the results of a fair voluntary reunion can spring from it. It is due to the court not to permit a solemn decree to be put aside by circumvention.

TILGHMAN C. J. This cause comes before us on a motion by *James Tiffin*, to quash an attachment taken out against him by his wife *Martha*, on a decree of divorce and alimony pronounced by the court in *September* 1803. The motion is grounded on an alleged reconciliation which took place between them in *September* 1806. On this point evidence has been offered, and it is proved beyond doubt, that Mrs. *Tiffin*, at the instance of her husband, did return to his home and cohabit with him four or five weeks, during which time she acted as mistress of the family. Their harmony was

1809.

TIFFIN
*v.*
TIFFIN.

not without interruption; but it cannot be said, that the fault was altogether on one side. *Tiffin* was in desperate circumstances. His goods and household furniture were taken in execution, and his wife left him; and after some time she took out an attachment, asserting that she had been fraudulently persuaded and tricked into a short reconciliation. Soon after the decree of this court, *Tiffin* conveyed to trustees for the use of his wife, in pursuance of the said decree, real and personal property of considerable value, which had belonged to her before their marriage. The alimony decreed by the court, was three hundred dollars a year, payable monthly; and it appears by the affidavit of the libellant, that three hundred and twenty-five dollars were in arrear, when she took out the attachment. The act of assembly is express, that the alimony shall only continue until a reconciliation shall take place. When the wife returns to her husband, she puts herself under his power, and gives up her claim to the arrears of her alimony.

. The court are strongly inclined to promote the union, rather than the separation of married people. They are not disposed therefore to strain the construction of the act of assembly in favour of a wife, who having been reconciled to her husband, leaves him again without just cause. The causes for divorce from bed and board, are, the husband's maliciously abandoning his family, turning his wife out of doors, or by cruel and barbarous treatment, endangering her life, or offering such indignities to her person as to render her condition intolerable, or life burthensome. It is not proved that Mrs. *Tiffin* experienced any treatment of this kind after the reconciliation took place. When the household goods were taken in execution, she left her husband's house, which, unless she had received ill treatment, she ought not to have done; for she was bound to adhere to her husband, and share his fortune in poverty or riches. If upon receiving ill treatment, she had brought her case before the court supported by proof, it would then have been considered whether the act of assembly authorizes us to order the arrears of alimony to be paid. As the matter stands we have no such power. The opinion of the court therefore, is, that the attachment was improperly issued, and must be quashed.

YEATES J. I have no hesitation in saying, that in family quarrels, the maltreatment of the wife by the husband, uniformly excites strong feelings in my mind, and that I view with much satisfaction every measure which tends to allay and compose those unhappy differences.

On the 14th *September* 1803 we separated *Martha Tiffin* from the bed and board of *James Tiffin*, and made the agreement of the parties the basis of our order of alimony. They lived in a state of separation for nearly three years, and came again together on the 6th *September* 1806 upon the solicitation of the husband; and so continued until the 14th *October* following, when the husband's effects being levied on under two executions, the wife left him.

The reconciliation of husband and wife by our act of 19th *September* 1785, vacates an order of alimony; and it is admitted on both sides, that the only question before us consists in the honest reality of that reconciliation. The counsel of the libellant have contended, that this temporary reunion was the effect of a fraudulent design to elude the decree of this court, and therefore not within the true reason of the law.

I know neither of the parties, nor their matrimonial conduct, except from the testimony taken in this cause. The husband has executed a deed to trustees, without reserving a power of revocation, of the property his wife had acquired before their intermarriage, in pursuance of the decree of this court. From the affidavit of the wife, stating that on the 12th *January* 1807, there were three hundred and twenty-five dollars due to her, it necessarily follows, that she must have received from him her separate maintenance for two years and three months.

I cannot consider the husband's soliciting his wife to return to his bed and board, as censurable, even if the embarrassed state of his affairs formed a considerable inducement to that measure. Mere pecuniary considerations too frequently form the *sine qua non* of matrimonial engagements even in early life. They had taken each other for *richer* or *poorer*. It has not been suggested that the pressure of *Tiffin's* debts was illusory; but it has been urged that *Lee* his present agent and bail was one of the plaintiffs in the executions. I see nothing in that circumstance from which

I am warranted to conclude that his views were fraudulent. No one will deny that it is the duty of a good wife to follow the state of her husband. Whether his fortunes are prosperous or adverse, she should not desert him, unless on the strongest grounds. I regard the cohabitation of *Tiffin* and his wife for five weeks, as irrefragable proof of their reconciliation, and do not find myself at liberty to penetrate into the recesses of their chamber. The act was voluntary on her part, and we must presume was done upon due consideration. She thereby disrobed herself of her right to demand this money, and conferred on her husband a right to retain it, unless some instance of maltreatment or plain fraud can be shewn to entitle her thereto. On a mere offer by the husband to take the wife back, the court would deliberately examine all the circumstances which had led to that offer; but the reality and sincerity of the reconciliation can only be known to the parties themselves, with the different grounds which have influenced their conduct. Had we even the power, we have not materials sufficient to ascertain which of them was most liable to blame in their family broils, or to what sources their domestic discontents are to be ascribed. I content myself with observing, that sufficient evidence appears to place the wife in a most unamiable point of view. She has spread her own bed, and there she must be contented to lie, though it may *now* appear to her a bed of torture. I am of opinion the attachment should be quashed.

BRACKENRIDGE J. concurred.

Attachment quashed.