# IDA M. THOMAS *v.* CARLOS B. THOMAS

[No. 40, September Term, 1981.]

*Decided November 5, 1982.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Theodore L. Mast,* with whom were *Robert S. Hoyert, Bill R. Yoho, Stephen H. Kiefert, Joseph F. Gaffigan, Richard M. Dull* and *Hoyert & Yoho* on the brief, for appellant.

*H. Michael Rankin,* appearing as Amicus Curiae after permission to do so was granted by the Court.

ELDRIDGE, J., delivered the opinion of the Court.

We issued a writ of certiorari in this case to decide whether a reconciliation, after a divorce *a mensa et thoro,* permanently terminates the right to receive alimony under an alimony award contained in the same decree as the *a mensa* divorce.

This case began on February 10, 1977, when Carlos B. Thomas filed a bill of complaint in the Circuit Court for Prince George's County, seeking a divorce *a mensa et thoro* and custody of two minor adopted children. The ground alleged was abandonment in September 1976 by his wife, Ida M. Thomas. Mrs. Thomas later filed a cross bill for a divorce *a mensa et thoro* or in the alternative a divorce *a vinculo matrimonii.* She sought alimony, child support and custody of the minor children.

Carlos Thomas, having left Maryland in June 1977 for Trinidad, West Indies, to pursue his career, failed to answer

Ida Thomas's cross bill.[1] Consequently, she moved for a decree *pro confesso* which was granted on September 22, 1977. It provided, *inter alia,* for a divorce *a mensa et thoro,* an award of custody of the two minor children to Ida Thomas, child support in the amount of $600 per month, and alimony also in the amount of $600 per month, both to begin from September 8, 1977. Neither the part of the decree granting an *a mensa* divorce nor the part awarding alimony contained any time limitations.[2]

Carlos Thomas returned to Maryland from Trinidad on December 4, 1977, at which time the parties reconciled and resumed cohabitation at their prior residence. Thereafter marital difficulties arose again, and on March 17, 1978, husband and wife separated for the second time when he left home and took the two children with him.

Unaware of the September 22, 1977, decree of divorce *a mensa et thoro,* Carlos Thomas filed a new bill for a divorce *a mensa et thoro* in the Circuit Court for Prince George's County on March 29, 1978. He also sought custody of the minor children.[3] On May 3, 1978, Ida Thomas filed a petition in the first case to hold her husband in contempt, alleging that he had failed and refused to make child support and alimony payments for the period of September 8, 1977, to May 1, 1978.[4] The amount of alimony claimed to be in arrears was $4,800. Mrs. Thomas also answered the bill in the second case, denying the allegations and pleading *res judicata.* The two cases were consolidated.

On May 29, 1980, after several hearings, the circuit court

---

**1.** It appears from the bill of complaint that Carlos Thomas is a citizen of Trinidad and a resident of Prince George's County, Maryland. He was legally married to Ida Thomas on July 19, 1966, in Winnipeg, Manitoba, Canada. She is a citizen of Canada and a resident of Maryland.

**2.** As discussed later, in Maryland the court may decree an *a mensa* divorce "forever, or for a limited time." Maryland Code (1957, 1981 Repl. Vol.), Art. 16, § 25.

**3.** Later, upon learning of the September 22, 1977, decree, Carlos filed a petition to modify that decree, praying that the sums awarded for child support and alimony in the September 22nd decree be stricken.

**4.** Mrs. Thomas also requested custody of the children, alleging that her husband had removed them from her custody on March 17, 1978, and had concealed their whereabouts.

ordered alimony arrearages in the total amount of $4,680.00 to be assessed against Carlos Thomas.[5] With respect to the period of September 8, 1977, to December 4, 1977, the court found that $1,700 in alimony arrearage was owed by Carlos Thomas; however, this amount was offset with money left in a bank account by Carlos which Ida Thomas expended, resulting in an $800 alimony overpayment. As to the period of reconciliation (December 4, 1977, to March 17, 1978), the court found that Mr. Thomas "was not obligated to pay alimony" because "it seems clear that alimony is not to continue upon cohabitation and that reconciliation causes alimony to cease during the period of reconciliation." The court alternatively held that "the parties' reconciliation constituted a substantial change in circumstances justifying modification." Finally, with respect to the period following reconciliation (March 17, 1978, to December 21, 1978, the date of the hearing), the court found that Mr. Thomas owed an alimony arrearage of $4,680 ($5,480 minus the $800 overpayment). As to this last period, it was the opinion of the circuit court that the parties' reconciliation did not terminate the right to receive alimony after the second separation because "the decree [of September 22, 1977] could not be revoked without the joint application of the parties as per Article 16, Section 25 of the Annotated Code of Maryland." The trial court also held that "the parties' reconciliation alone is not a sufficient change in circumstance to permit modification of the original decree so that no future alimony was required of the plaintiff [Mr. Thomas]."

Carlos Thomas appealed to the Court of Special Appeals, contending that the reconciliation terminated his wife's right to receive alimony subsequent to their separation on March 17, 1978, and that, therefore, the court erred in ordering that he pay alimony arrearage in the amount of $4,680. He also contended that the lower court erred in

---

5. Further court orders included: a denial of Carlos's petition to modify the September 22, 1977, alimony award; a modification of the September 22, 1977, decree, by awarding custody of the two children to Carlos; and a termination of Carlos's obligation to pay Ida child support, effective as of December 4, 1977.

denying his petition to modify the September 22, 1977, decree regarding alimony. Ida Thomas filed no cross appeal.

The Court of Special Appeals reversed, holding that Carlos Thomas was not obligated to pay alimony for the period subsequent to the second separation. *Thomas v. Thomas,* 48 Md. App. 255, 426 A.2d 976 (1981). While stating that a divorce *a mensa* is revoked only by subsequent judicial action, the Court of Special Appeals nevertheless held that alimony awarded as part of the same decree is not "inextricably" tied to the *a mensa* divorce, that the alimony obligation ceases upon a bona fide reconciliation, and that it is not automatically revived by a subsequent separation of the parties. In light of this holding, the Court of Special Appeals found it unnecessary to consider the contention by Carlos Thomas that the circuit court erred in denying his petition to modify the September 22, 1977, decree.

Contending "that the effect of a reconciliation upon an award of alimony arising from a decree of divorce *a mensa et thoro* is not to "permanently terminate the right to receive that alimony," Ida Thomas filed a petition for a writ of certiorari which we subsequently granted. 290 Md. 723. We shall affirm.

I

Before addressing the petitioner's specific argument, a review of part of the history of divorce and alimony in Maryland would be useful.

(a)

In England, during the seventeenth and eighteenth centuries, courts did not grant absolute divorces (divorce *a vinculo matrimonii*), but the ecclesiastical courts would grant divorces from bed and board (divorce *a mensa et thoro*). Incidental to the *a mensa* divorce, the ecclesiastical courts could award alimony to the wife. Nevertheless, for most of this period, alimony had no independent existence under English law; it could be awarded only by an ecclesiastical

court and only as part of a divorce decree.[6] This English "doctrine was adopted and followed in . . . many of the States in this country, but not in Maryland." *Courson v. Courson,* 213 Md. 183, 185, 129 A.2d 917 (1957).[7]

There were in fact never any ecclesiastical courts in Maryland,[8] and prior to the first general divorce statute in 1841, divorce in specific cases was deemed exclusively a legislative function. *Crane v. Meginnis,* 1 G. & J. 463, 474, 19 Am. Dec. 237 (1829). Consequently, it has been consistently held that a court of equity has no inherent power to grant either an *a mensa* or an *a vinculo* divorce, and that an equity court's jurisdiction to grant a divorce stems entirely from and is circumscribed by statutory authority. *Fisher v. De Marr,* 226 Md. 509, 515, 174 A.2d 345 (1961); *Courson v. Courson, supra,* 213 Md. at 186; *Foote v. Foote,* 190 Md. 171, 176, 57 A.2d 804 (1948); *Woodcock v. Woodcock,* 169 Md. 40, 46, 179 A. 826 (1935); *Emerson v. Emerson,* 120 Md. 584, 589, 87 A. 1033 (1913); *Etheridge v. Etheridge,* 120 Md. 11, 12, 87 A. 497 (1913); *Outlaw v. Outlaw,* 118 Md. 498, 500-501, 84 A. 383 (1912); *Stewart v. Stewart,* 105 Md. 297, 300, 66 A. 16 (1907); *Wright v. Wright's Lessee,* 2 Md. 429, 448, 56 Am.Dec. 723 (1852); *Helms v. Franciscus,* 2 Bland 554, 568, 20 Am.Dec. 402 (1830); *Fornshill v. Murray,* 1 Bland 479, 482-483, 18 Am. Dec. 344 (1828).[9]

---

**6.** During the short period from the decapitation of King Charles I until the restoration of the monarchy, the ecclesiastical courts were abolished in England, and equity assumed jurisdiction to grant alimony. *See* the discussions in Courson v. Courson, 213 Md. 183, 185, 129 A.2d 917 (1957); Helms v. Franciscus, 2 Bland 544, 565-566, 20 Am. Dec. 402 (1830).

**7.** Many cases, in addition to *Courson,* have reviewed the history of divorce and alimony in England and in Maryland. *See, e.g.,* Bender v. Bender, 282 Md. 525, 529-531, 386 A.2d 772 (1978); Altman v. Altman, 282 Md. 483, 490-491, 386 A.2d 766 (1978); Foote v. Foote, 190 Md. 171, 176-180, 57 A.2d 804 (1948); Helms v. Franciscus, *supra. See also* the extensive review in the Court of Special Appeals' opinion in the present case, Thomas v. Thomas, 48 Md.App. 255, 426 A.2d 976 (1981).

**8.** *See infra* note 14.

**9.** Although in the absence of statutory authority a court of equity could not decree even an *a mensa* divorce, if a husband were "beating his wife . . . or introduced lewd women with her into the household," equity, "from necessity, and with a view to preserve the public peace, or to prevent the open contamination of the morals of society," would "enforce a separation." Helms v. Franciscus, *supra,* 2 Bland at 561. *See* Bread's Case, 2 Bland 562 notes (1681).

The first statute in Maryland authorizing equity courts to grant divorces, both *a mensa* and *a vinculo,* was Ch. 262 of the Acts of 1841 which, as amended and expanded in subsequent years, is found in Code (1957, 1981 Repl. Vol.), Art. 16, §§ 24 and 25. Notwithstanding the 1841 authorization for judicial divorces, this Court held that the General Assembly could by statute grant divorces in individual cases. *Wright v. Wright's Lessee, supra,* 2 Md. at 447-451.[10]

Following the 1841 statute, this Court took the position that divorce proceedings should be governed by the principles of the English ecclesiastical courts insofar as those principles were consistent with Maryland statutes. Thus in *J. G. v. H. G.,* 33 Md. 401, 406-407, 3 Am. Rep. 183 (1870), the Court summarized:

> "In respect to the mode in which Courts of Equity shall exercise jurisdiction in divorce cases, and the principles by which they are to be governed, the Code is silent. But from the nature of the jurisdiction itself, it has always been considered that the decisions of the English Ecclesiastical Courts, in similar cases, may properly be referred to as precedents; and they have uniformly been cited and relied on as safe and authoritative guides for the Courts of this State in disposing of cases of this kind."[11]

One of the principles of the ecclesiastical courts was that an *a mensa* divorce decree was extinguished upon the reconciliation of the parties. *See* the discussion by Chancellor Kent in *Barrere v. Barrere,* 4 Johns Ch. 187, 191-192 (N.Y. 1819) (suggesting that this was due to the form of decree used by the courts). *See also* T. Poynter, *A*

---

**10.** Art. III, § 33, of the Maryland Constitution now prohibits special laws granting divorces. *See* Courson v. Courson, *supra,* 213 Md. at 186.

**11.** *Accord* Gold v. Gold, 191 Md. 533, 537-538, 62 A.2d 540 (1948); Lickle v. Boone, 187 Md. 579, 582, 51 A.2d 162, 170 A.L.R. 156 (1947); Dougherty v. Dougherty, 187 Md. 21, 29, 48 A.2d 451 (1946); Emerson v. Emerson, 120 Md. 584, 590, 87 A. 1033 (1913); Fisher v. Fisher, 95 Md. 314, 318, 52 A. 898 (1902).

*Concise View of the Doctrine And Practice Of The Ecclesiastical Courts In Doctor's Commons On Various Points Relative to the Subject of Marriage and Divorce,* p. 182 (2d ed. 1836). Some of the divorce statutes in this country embodied this rule, whereas others, as construed, did not.[12]

The 1841 Maryland statute contained no language relating to the termination of an *a mensa* divorce. Because of this, Chancellor Johnson in 1851 took the position that under the provisions of the Maryland act relating to *a mensa* divorces, he could only decree a permanent separation, lasting forever. *Coles v. Coles,* 2 Md. Ch. 341 (1851). He contrasted the Maryland statute with that of New York, saying (2 Md. Ch. at 352):

> "Our statute, unlike that of New York, would compel me, if I interfere at all, to separate these parties permanently, and not for a limited time. There, the decree may be for a limited period, or forever, as under the circumstances may seem just and reasonable. With us, as the decree must place a perpetual barrier between the husband and wife, the causes which should lead to it ought to be more urgent and imperative, than if by a temporary separation, opportunity would be given for reconciliation, a consideration, says Chancellor Kent, of more weight 'if the unhappy parties have a common offspring to be affected by their infirmities.' "

By Ch. 272 of the Acts of 1872, the General Assembly, perhaps because of the decision in *Coles,* provided that a court may decree an *a mensa* divorce "forever, or for a limited time" and that in all cases an *a mensa* divorce "may be revoked at any time thereafter by the court granting the same, upon the joint application of the parties to be dis-

---

12. *Compare* Harris v. Lumbermen's Mutual Casualty Co., 48 So. 2d 728, 730 (La. App. 1950); Succession of Charles Liddell, 22 La. Ann. 9 (1870); M'Karracher v. M'Karracher, 3 Yeates 56 (Pa. 1800); *and* Rudolph's Estate, 128 Pa. Super. 459, 462-463, 194 A. 311 (1937) *with* Jones v. Jones, 29 A. 502 (N.J. Ch. 1894) *and* Barrere v. Barrere, 4 Johns Ch. 187 (N.Y. 1819).

charged from the operation of the decree." The identical language remains today in Art. 16, § 25.[13]

### (b)

As mentioned before, the relationship between divorce and alimony under the English law was adopted in some areas of this country but not in Maryland. Although under Maryland law divorce and alimony are tied together for certain purposes, alimony has never been viewed as an incident of divorce. Indeed, the jurisdiction of equity courts to grant alimony, unlike a divorce, was not based upon statute. Instead, the power to grant alimony was deemed to be within the inherent authority of Maryland equity courts.

Almost a century before the first Maryland statute dealing with alimony (Ch. 22 of the Acts of 1777), and a century and a half before the first statute authorizing divorce, the Provincial Court of Maryland held that alimony was recoverable either in "Chancery or in a Court of Ordinary." *Galwith v. Galwith,* 4 H. & McH. 477 (1689).[14] There

---

13. This language, apparently taken from the New York statute, and ultimately based on Chancellor Kent's *Barrere* opinion, has been construed by some courts to mean that an *a mensa* divorce decree does not always automatically terminate upon the reconciliation of the parties, and that, if the decree itself does not state when it shall terminate, an application to the court is necessary. Jones v. Jones, *supra,* 29 A. at 503-505; Gewirtz v. Gewirtz, 189 App. Div. 483, 178 N.Y.S. 738 (1919). *See also* the discussion by Judge Wilner for the Court of Special Appeals in the present case, Thomas v. Thomas, *supra,* 48 Md. App. at 266-267. This Court has never decided the issue.

14. The Court of Ordinary was described in Thomas, *Chronicles of Colonial Maryland* 169 (2d ed. 1913), as follows:

"A title very common in the English ecclesiastical system is that of the 'ordinary', who is defined as being 'one possessing immediate jurisdiction in his own right and not by special deputation'; as, 'a bishop, archbishop, or other ecclesiastic or his deputy, in his capacity as an *ex officio* ecclesiastical judge."

Thomas goes on to describe the situation in colonial Maryland (*id.* at 174):

"As for government, the church had none. The 'ordinary' was mentioned in the legislation on the subject, but there was no ordinary; and throughout the period we are considering there was no bishop, the first bishop, Claggett, not being elected until 1792."

*See also id.* at 111-136 (describing the judicial system in colonial Maryland).

are several reported cases prior to 1777 of the Chancellor decreeing alimony, both pendente lite and permanent. *Govane's Case,* 2 Bland 570 notes (1752); *Scott's Case,* 2 Bland 568 notes (1747); *Lynthecumb's Case,* 2 Bland 568 notes (1738); *Sarah Wright's Case,* 1 Bland 101 notes (1730, 1732); *Codd v. Codd,* 1 Bland 101 notes (1729); *Macnamara's Case,* 2 Bland 566 notes (1707).

By Ch. 22 of the Acts of 1777, now Code (1974, 1980 Repl. Vol.), § 3-603(a) of the Courts and Judicial Proceedings Article, the Legislature provided that a court of equity should hear and determine a case of alimony "as such case could be heard and determined by the Ecclesiastical Courts of England." As pointed out on many occasions, the 1777 statute merely confirmed the previously existing inherent authority of equity courts over the matter of alimony. *Dackman v. Dackman,* 252 Md. 331, 345-346, 250 A.2d 60 (1969); *Courson v. Courson, supra,* 213 Md. at 185; *Commonwealth of Penna. v. Warren,* 204 Md. 467, 473, 105 A.2d 488 (1954); *Woodcock v. Woodcock, supra,* 169 Md. at 46; *Outlaw v. Outlaw, supra,* 118 Md. at 501; *Taylor v. Taylor,* 108 Md. 129, 130-131, 69 A. 632 (1908); *Stewart v. Stewart, supra,* 105 Md. at 300; *Wright v. Wright's Lessee, supra,* 2 Md. at 450; *Helms v. Franciscus, supra,* 2 Bland at 566-568.[15] Consequently, after judicial divorces were authorized, an eligible plaintiff continued to be able to obtain an award of alimony even though no divorce was sought. *Wald v. Wald,* 161 Md. 493, 502, 159 A. 97 (1931); *Outlaw v. Outlaw, supra; McCaddin v. McCaddin,* 116 Md. 567, 568, 82 A. 554 (1911); *Jamison v. Jamison,* 4 Md. Ch. 289, 293 (1847).[16]

---

**15.** Awarding alimony was deemed to be so clearly an inherent judicial function that a legislative award of alimony to a specific individual was held unconstitutional under the separation of powers provision in the Maryland Declaration of Rights. Crane v. Meginnis, 1 G. & J. 463, 19 Am. Dec. 237 (1829).

**16.** Although the authority to grant alimony was not based on statute, and alimony could be sought without seeking a divorce, Chancellor Bland in 1830 held that under the wording of the 1777 statute, alimony could not be awarded unless grounds existed for granting an *a mensa* divorce by the ecclesiastical courts in England. Helms v. Franciscus, *supra,* 2 Bland at 567-568. Later, in Jamison v. Jamison, 4 Md. Ch. 289, 294-298 (1847), Chancellor Johnson rejected Chancellor Bland's interpretation of the 1777 statute and held that alimony could be awarded even though the plaintiff

Although this Court has not previously considered whether or under what circumstances an *a mensa* divorce decree terminates upon reconciliation of the parties, we have on several occasions addressed the effect of reconciliation upon an alimony award. As early as *Wallingsford v. Wallingsford,* 6 H. & J. 485, 488 (1823), the Court stated with regard to an award of alimony: "upon their mutual consent to live together, it ceases." [17] Since that time, the Court has consistently reaffirmed that an award of alimony ceases upon the reconciliation of the parties. *Bebermeyer v. Bebermeyer,* 241 Md. 72, 76-77, 215 A.2d 463 (1965) (alimony continues "so long as the parties live separate and apart"); *Courson v. Courson, supra,* 213 Md. at 186; *Foote v. Foote, supra,* 190 Md. at 176; *Dickey v. Dickey,* 154 Md. 675, 678, 141 A. 345 (1928); *Blades v. Szatai,* 151 Md. 644, 649, 135 A. 841, 50 A.L.R. 232 (1927); *Hood v. Hood,* 138 Md. 355, 359, 113 A. 895, 15 A.L.R. 774 (1921); *Polly v. Polly,* 128 Md. 60, 63, 97 A. 526 (1916); *Emerson v. Emerson, supra,* 120 Md. at 590; *McCaddin v. McCaddin, supra,* 116 Md. at 574; *Hokamp, Ex'r v. Hagaman,* 36 Md. 511, 517 (1872).[18]

---

had insufficient grounds for a divorce. This Court has adhered to the position of Chancellor Bland, holding that under the 1777 statute, before a plaintiff is entitled to alimony, it is necessary that facts be shown as would entitle the plaintiff to a divorce *a vinculo* or *a mensa* under Maryland law. Bender v. Bender, *supra,* 282 Md. at 530; Blumenthal v. Blumenthal, 258 Md. 534, 266 A.2d 337 (1970); Jester v. Jester, 246 Md. 162, 170, 228 A.2d 829 (1967); Walthen v. Walthen, 245 Md. 684, 686-687, 226 A.2d 350 (1967); Polly v. Polly, 128 Md. 60, 62, 97 A. 526 (1916); Outlaw v. Outlaw, 118 Md. 498, 502-504, 84 A. 383 (1912).

It should also be noted that in certain other respects, the General Assembly has regulated the award of alimony. Code (1957, 1981 Repl. Vol.), Art. 16, §§ 1-5B.

17. Before the *Wallingsford* case, this principle was reflected in earlier reported decrees of the chancellors. *See* Govane's Case, 2 Bland 570, 573 notes (1752) (alimony awarded "until the complainant and defendant shall mutually agree to cohabit together"); Scott's Case, 2 Bland 568, 569-570 notes (1747) (alimony decree for the parties' joint lives "unless they shall be reconciled, and mutually agree to cohabit together; and in case of such reconciliation and cohabitation, the said payment to cease"); Macnamara's Case, 2 Bland 566, 567 notes (1707) (alimony ordered "during the time the said Thomas and Margaret shall continue separate, and until they shall mutually reconcile themselves to each other, and cohabit").

18. By Ch. 575 of the Acts of 1980, the Legislature *inter alia* enacted Art. 16, § 5 (b), of the Code which provides:

"(b) Unless the parties otherwise agree, the obligation to pay alimony under this title shall terminate upon the death of either

## II

Against this background, we shall now turn to the petitioner's arguments.

Petitioner acknowledges that in Maryland, an award of alimony by itself permanently ceases upon the reconciliation of the parties. She asserts that prior to the enactment of Ch. 272 of the Acts of 1872, an *a mensa* divorce decree was automatically revoked if the parties reconciled, and if an *a mensa* divorce and alimony were contained in the same decree, both the divorce and the award of alimony were revoked by a reconciliation. In petitioner's view, whenever a divorce and award of alimony were in the same decree, they were "inseparable." Next, petitioner contends that with the 1872 statutory change, an application to the court became the exclusive method of terminating an *a mensa* divorce. While conceding that the 1872 statute makes no reference to alimony, she claims that the inseparability of divorce and alimony, if in the same decree, continued after the 1872 enactment. Petitioner concludes that, because an application to an equity court is now the exclusive means of terminating an *a mensa* divorce, it is also the exclusive means of terminating an alimony award contained in the same decree.[19] It is suggested that entitlement to alimony

---

party, the marriage of the party receiving alimony, or if the court finds that termination is necessary to avoid a harsh and inequitable result."

Ch. 575 was based on the recommendations of the Governor's Commission On Domestic Relations Laws, and Art. 16, § 5 (b), was enacted in exactly the form recommended by the Commission. Nothing in the Commission's report suggests that § 5 (b) was intended to modify the long established rule that reconciliation terminates an award of alimony. *See Report of The Governor's Commission On Domestic Relations Laws,* pp. 11-12, 16 (January 18, 1980). We need not explore the question any further at this time, as § 3 of Ch. 575 states that the act shall apply only to cases filed after July 1, 1980, and the present case was filed before that date.

**19.** Petitioner's theory is set forth in her brief as follows (pp. 6-7):

"From the fact that alimony *can* be obtained independent from divorce however, does not follow the conclusion that alimony is not still tied to the divorce when there *is* a divorce.

Actions for alimony alone existed before, as well as after, the enactment of the 1872 statute. Until 1872, however, a divorce *a mensa* would be revoked by reconciliation, as would alimony awarded in the same decree. Whatever happened to the Decree *a mensa* likewise happened to the alimony. The divorce and alimony

under an *a mensa* divorce decree "abate[s]" during a period of reconciliation and cohabitation, and is revived after a further separation (petitioner's brief, p. 4).

Preliminarily, the view that the Legislature, by Ch. 272 of the Acts of 1872, intended to *restrict* the means of terminating an *a mensa* divorce and an award of alimony in the same decree, is dubious in light of the underlying history. As pointed out in Part I above, *Coles v. Coles, supra,* held that *a mensa* divorces necessarily continued forever under the wording of the 1841 statute. We are aware of no Maryland case suggesting a contrary view or indicating that under the 1841 statutory language an *a mensa* divorce was revoked by the reconciliation of the parties. It would seem that the purpose of the 1872 statute was to change the holding in *Coles* and liberalize the law concerning the termination of an *a mensa* divorce.

Furthermore, it is clear that application to an equity court was not intended to be the exclusive means of revoking an *a mensa* divorce decree. By authorizing an equity court to decree an *a mensa* divorce "for a limited time," the Legislature in 1872 obviously authorized decrees which would automatically terminate by their own terms. Therefore, in light of the 1872 amendment, a Chancellor today could utilize the form of the ecclesiastical courts and expressly provide that an *a mensa* divorce would terminate upon the parties' reconciliation.

When an *a mensa* divorce decree contains no language regarding termination, the effect of a reconciliation upon the

---

were inseparable. It is true, as the Court of Special Appeals points out, that the 1872 statute makes no reference to alimony. But the act also does not specifically say that alimony awarded pursuant to an *a mensa* decree is severable from that decree. . . .

If any theory of ecclesiastical law is to be applied in the present case, it should be the one which holds that divorce and alimony, when part of the same decree, are inexorably tied together. This is true even though Appellant now urges a different result then was contemplated by ecclesiastical law. No case or statutory law has appeared in Maryland to undermine the theory of the inseparability of divorce *a mensa* and alimony awarded in the same decree."

decree is less clear in light of the 1872 amendment. This Court has said that "a divorce *a mensa et thoro* is practically nothing more than judicial permission to live separate and apart," *Dougherty v. Dougherty,* 187 Md. 21, 31, 48 A.2d 451 (1946). *See Gellar v. Gellar,* 159 Md. 236, 241, 150 A. 717 (1930). Therefore, even where an *a mensa* divorce decree contains no language relating to its termination, it would seem logical to treat the decree as nullified upon the reconciliation and cohabitation of the parties. This result would be in accord with the principle that, where Maryland divorce law is silent on a particular matter, we will follow the decisions of the English ecclesiastical courts. On the other hand, we recognize that, with respect to *a mensa* divorce decrees containing no time limitations, courts in other states have construed language identical to the 1872 amendment as requiring a judicial application to terminate the divorce, regardless of the parties' reconciliation. *See* note 13, *supra.* We need not decide this issue in the present case, for, in our view, whether or not the reconciliation between Carlos Thomas and Ida Thomas nullified the *a mensa* divorce in the September 1977 decree, the reconciliation did permanently terminate Ida Thomas's right to receive alimony under that decree.

The petitioner's argument that the reconciliation did not terminate the alimony award in this case is based upon the asserted historic "inseparability" of an alimony award and an *a mensa* divorce when both are contained in the same decree. But as shown in Part I above, there was no such historic inseparability. Awards of alimony were based upon the inherent authority of equity courts; such awards were made in Maryland from the earliest times; and the right to receive alimony under a decree has always been deemed to cease upon reconciliation and cohabitation. A judicially decreed *a mensa* divorce, on the other hand, did not exist until 1841; it is entirely a creature of statute; and, prior to the 1872 amendment, the only reported Maryland case on the subject *(Coles v. Coles)* indicated that an *a mensa* divorce did not terminate upon reconciliation.

Moreover, none of the Maryland opinions taking the position that an alimony award ceases upon reconciliation and cohabitation, from *Wallingsford v. Wallingsford* in 1823 through *Bebermeyer v. Bebermeyer* in 1965, have suggested a different rule when the alimony award is in the same decree as an *a mensa* divorce. In *McCaddin v. McCaddin, supra,* 116 Md. at 574, the Court set forth the rule after referring to an *a mensa* divorce or an award of alimony without divorce:

> "It seems, therefore, to be well settled that at least when a divorce *a mensa et thoro* is granted, or when there is an allowance of alimony without divorce, the decree can be modified as circumstances may require, subject, of course, to some well established rules, and in this State alimony ceases upon the death of either party, or upon their living together."

Earlier, in *Hokamp, Ex'r v. Hagaman, supra,* 36 Md. at 516, a provision for alimony was contained in the same decree as an *a mensa* divorce, and there was later a reconciliation and subsequent separation. Although this was not the issue before the Court, it was observed that "upon their reconciliation, the provision ceased." *Id.* at 517.

It is obvious that two distinct claims do not necessarily become inseparable or interdependent merely because they are dealt with in a single judgment or decree. A subsequent event may affect one matter in a decree without affecting a different but related matter contained in the same decree. *Stancil v. Stancil,* 286 Md. 530, 535-536, 408 A.2d 1030 (1979).

Consequently neither history nor precedent nor logic supports petitioner's argument that an alimony award and an *a mensa* divorce, contained in the same decree, are inseparable for purposes of determining the effect of a reconciliation. Assuming for the purpose of argument that a bona fide reconciliation does not automatically terminate an *a mensa* divorce in Maryland, it does terminate a prior

award of alimony whether or not that award is contained in the same decree as the *a mensa* divorce.

Finally, we reject petitioner's contention that a reconciliation operates only to suspend an alimony award during the period of reconciliation, and that the award is automatically revived following a subsequent separation.[20] The Maryland cases, while not specifically addressing this contention, are inconsistent with the theory that reconciliation merely suspends the operation of an alimony decree. The principle adhered to in Maryland is that alimony "ceases" upon reconciliation and cohabitation. *E.g., Blades v. Szatai, supra,* 151 Md. at 649; *Polly v. Polly, supra,* 128 Md. at 63; *McCaddin v. McCaddin, supra,* 116 Md. at 574; *Wallingsford v. Wallingsford, supra,* 6 H. & J. at 488. As aptly stated by the Court of Special Appeals in the instant case, " 'cease' means 'to end; to stop; to discontinue' (Webster's New Twentieth Century Dictionary, Unabridged), and not to 'suspend.' " *Thomas v. Thomas, supra,* 48 Md. App. at 271. In *Hokamp, Ex'r v. Hagaman, supra,* 36 Md. at 516-517, which did involve a second separation following a reconciliation, the Court nevertheless restated the general rule that "upon their reconciliation, the provision [for alimony] ceased."

In our view, the better reasoned position is that an ali-

---

**20.** A few cases in other jurisdictions do support petitioner's "revival" theory with regard to alimony. Atkinson v. Atkinson, 233 Ala. 125, 170 So. 198, 200 (1936); McIlroy v. McIlroy, 208 Mass. 458, 94 N.E. 696 (1911); Justice v. Justice, 108 N.E.2d 874, 876 (Ohio Comm. Pl. 1952).

Other cases reject the theory, taking the position that an alimony decree is not revived by a second separation following the reconciliation, and that a new application to the court is necessary. Brown v. Brown, 210 Ga. 233, 78 S.E.2d 516, 518 (1953); Moody v. Moody, 227 La. 134, 78 So.2d 536, 537 (1955); Hester v. Hester, 239 N.C. 97, 100, 79 S.E.2d 248 (1953); O'Hara v. O'Hara, 46 N.C. App. 819, 266 S.E.2d 59 (1980); Tiffin v. Tiffin, 2 Binn. 202 (Pa. 1809); M'Karracher v. M'Karracher, *supra,* 3 Yeates 56; Hill v. Hill, 62 Pa. Super. 439 (1916); Lund v. Lund, 6 Utah 2d 425, 315 P.2d 856, 858 (1957); Patterson v. Patterson, 4 D.L.R. 793 (Ont. 1928).

*See also* Hawn v. Hawn, 505 S.W.2d 459, 463 (Mo. App. 1974) (holding, on the facts, that there was no reconciliation but only an "attempted" reconciliation, and reserving the question of revival of the alimony award if there had been a bona fide reconciliation). In the instant case, the petition for a writ of certiorari raised no challenge to the findings below that there had been a bona fide reconciliation. Thus, the issue is not before us. Maryland Rule 813 a.

mony decree, followed by a reconciliation, should not automatically revive upon a subsequent separation. The period of reconciliation might last several years. Circumstances would almost always be different after a long period of reconciliation. Because of this, it seems preferable to require, after a subsequent separation, that the spouse seeking alimony re-apply to a court of equity. Furthermore, we agree with the observation of the Supreme Court of Utah in *Lund v. Lund,* 6 Utah 2d 425, 315 P.2d 856, 858 (1957):

> "It would be a hard rule to hold that where the parties resume the marital relationship after entry of the [alimony] decree, that regardless of how happy the parties may have been for six months, one, two or three years, that one party could hold the ... decree over the head of the other and demand that the line be toed. With the realization that after the parties have become reconciled and have resumed the marital relationship, except in flagrant cases where fraud is present and good faith absent, the cause of action was dead and was no longer available to obtain a quick final decision, it is very probable that the parties might well be induced to try harder to make a success of the marriage in order not to be required to start from scratch."

Therefore, we agree with the Court of Special Appeals that the parties' bona fide reconciliation and cohabitation permanently terminated the portion of the September 1977 decree relating to alimony.

*Judgment of the Court of Special Appeals affirmed.*
*Petitioner to pay costs.*