736 A.2d 400

Shawn R. TORBOLI

v.

Joseph A. TORBOLI.

No. 1248, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Sept. 2, 1999.

Thomas A. Wade, Hagerstown, for appellant.

Steven Robert Cohen, Frederick, for appellee.

Argued before MURPHY, C.J., and MOYLAN, and MARVIN H. SMITH (Retired, Specially Assigned), JJ.

MARVIN H. SMITH, Judge, Retired, Specially Assigned.

Appellant, Shawn R. Torboli (Mrs. Torboli), appeals from the judgment of the Circuit Court for Washington County declining to enforce the family maintenance provision of a protective order issued by that court against her husband, appellee Joseph A. Torboli (Mr. Torboli), because it found that the parties had reconciled during the term of the order. The circuit court held that the family maintenance provision was nullified.

We rephrase the issues raised by Mrs. Torboli as follows:

I. Did the circuit court err in its finding that a reconciliation had occurred between the parties?

II. Did the circuit court err in holding that a reconciliation between the parties nullified family maintenance payments under Md.Code (1984, 1999 Repl.Vol.), § 4–506(d)(8) of the Family Law Article?

We perceive no error by the circuit court. Accordingly, we shall affirm its judgment.

## FACTS

On June 22, 1995, the Circuit Court for Washington County issued a protective order at the request of Mrs. Torboli against her husband. The order was to remain in effect until January 8, 1996, approximately six months. Besides granting Mrs. Torboli temporary custody of the parties' then twelve-year-old daughter, the protective order set forth several mandates. It said that Mr. Torboli was not to abuse, threaten, or harass Mrs. Torboli, and that he was to stay away from Mrs. Torboli's place of employment and their daughter's school. In addition, the order directed Mr. Torboli to pay emergency family maintenance to Mrs. Torboli in the amount of $750 a month. The first payment was due on June 26, 1995. Each succeeding payment was due "on or before the 30th day of each month thereafter. . . ."

Under the terms of the order Mrs. Torboli was to vacate the family home "immediately," apparently because it was located in a secluded area and she did not wish to stay there. She was allowed to enter the marital home between the hours of 12 noon and 4 P.M. on June 24 "without the presence of [Mr. Torboli] to remove her and her daughter's personal clothing, shoes & personal items & effects." Mr. Torboli was forbidden to enter the residence of Mrs. Torboli "at 2029 Reed Road or any future residence" of Mrs. Torboli.

On October 4, 1996, almost ten months after the order expired, Mrs. Torboli petitioned the circuit court to enforce the family maintenance provision of the order. She claimed that Mr. Torboli had paid but $640 of the $5,250 directed to be

paid under the terms of the order. The court dismissed the petition without a hearing, holding that it could not enforce a provision of a protective order after the order had expired. We reversed the circuit court's holding on appeal and remanded to the circuit court for further proceedings.[1]

The court held a hearing upon remand and took testimony from the parties, their daughter, and two co-workers of Mr. Torboli. Mrs. Torboli testified as to her and her daughter's living arrangements after the order was issued. She said that the first three weeks after issuance of the June 22 order she and her daughter stayed at her parents' house. They then stayed at the apartment of Mrs. Torboli's niece for about two months and then at two other apartments until they moved into a fourth apartment on December 1. Mrs. Torboli testified that she went to the marital residence "maybe once or twice a month[ ]" to "do things" as long as Mr. Torboli was not there. She admitted to spending the night in the house "[j]ust a couple" of times, but again only when she knew Mr. Torboli would not be there.

Mrs. Torboli testified that by the end of July, her husband had paid her $640 of the family maintenance order. After that, he did not pay her any more money under the order. She said that while the order was in effect she cashed her husband's paychecks for him and paid their household bills out of a joint account. She stated that she and her daughter left some of their personal items at the marital residence because Mr. Torboli would not allow her to take them.

The parties' daughter testified that during part of the time the order was in effect her parents lived like a married couple at the Boonsboro Road home; at other times, her parents would fight and then she and her mother would move out. She said that sometimes her mother intentionally tried to avoid her father and sometimes her mother was willingly with her father. She recalled mornings when both her parents were present. She further recalled times her mother ate at

---

1. *See Torboli v. Torboli,* 119 Md.App. 684, 705 A.2d 1186 (1998).

the house. She testified that they did not move all their belongings out of the house until December, 1996.

Mr. Torboli testified that after the court hearing, he, his wife, and his wife's attorney discussed whether the parties would be able to reconcile. The consensus then was that the parties would separate for a while but that they could reconcile after that. Mr. Torboli stated that a couple of weeks after the court order both Mrs. Torboli and their daughter moved back into the house where they stayed, except for a few absences, until December 15 at which time they moved their belongings out. He testified that he and his wife engaged in sexual relations during the time the court order was in effect. He also said that his wife paid their household bills and cashed his checks.

Eric Norris, a co-worker and friend of Mr. Torboli's for eighteen years, testified that he often carpooled with Mr. Torboli during the time that the order was in effect. On one such occasion he went to the Torbolis' residence around 3:00 p.m. to pick up Mr. Torboli. When he arrived, Mr. Torboli, his wife, and their daughter were present in the house. Mr. Norris also testified that he often telephoned the Torbolis' residence regarding whether Mr. Torboli was picking him up. Mrs. Torboli answered the phone on maybe half-a-dozen occasions, and told him that Mr. Torboli was on his way. Norris also asserted that Mr. Torboli often drove Mrs. Torboli's car to work on the weekends, and that on the occasions that he picked up Mr. Torboli her car was in the driveway.

Jeff Riggleman, another co-worker and friend of Mr. Torboli's for six years, testified that one evening in November he stopped by the Torbolis' home at "maybe six, 7:00 o'clock in the evening." Mr. Torboli, his wife, and their daughter were present. He recalled that at that time Mrs. Torboli had on what appeared to him to be flannel pajamas. When pressed on cross-examination he said, "they didn't look like anything you would wear out on the street." Riggleman said, and the court included this in the finding of facts, that on one occasion when he was at the marital home in the June to December

period in question, Mrs. Torboli "offered [him] something to drink. Soda." Mr. Riggleman and Mr. Torboli carpooled during the relevant time. On those occasions that Mr. Riggleman called the Torboli home to find out about carpool arrangements Mrs. Torboli answered the telephone.

The court's findings of facts stated in part:

The Court finds that sometime in July of 1995, before July 30th, 1995 . . . that Mr. and Mrs. Torboli essentially began living together in the same house. Although frequently, Mr. Torboli was not there because of shift work and Ms. Torboli was out of the household for a period, I find as a fact, of three to four weeks after various arguments during the time period between July and December 1995.

\* \* \*

The daughter, JoAnna Torboli, further corroborated that she and Ms. Torboli were basically living in the family home for much of June through December, 1995. And without going through all her testimony, she did appear to have a fairly good knowledge as to where she was living.

I do not find Ms. Torboli to be particularly credible. I rely, in this regard, on my observations of her demeanor and manner of testimony. One example is, in that regard, she testified that Mr. Torboli would not give her access to get any property out of the home, yet she spent, by her own admission, one to two nights per month in the house for periods that were six to eight hours at a time, and obviously if she wanted to take things out of the homes, she could have removed them during those times.

The court said the testimony of Mr. Riggleman and Mr. Norris was credible. The court found "as a fact the parties did intend to reconcile and did, for the most part, live in the same residence between July 1 and December 15, 1995."

Believing that "a party cannot pick and choose which portions of the order that she wants to embrace[,]" and relying upon *the* decision in *Thomas v. Thomas,* 294 Md. 605, 451 A.2d 1215 (1982), the court "f[ou]nd as a fact that the parties did

not intend to rely on the protective order after sometime in July of 1995." The court ordered Mr. Torboli to pay Mrs. Torboli $110, the difference between $750, the amount awarded under the protective order for June, and $640, the amount Mr. Torboli paid. It is from this ruling that Mrs. Torboli appeals.

## DISCUSSION

### I.

Mrs. Torboli's first argument on appeal is that the court's finding that the parties had reconciled was in error because it was not supported by the facts in evidence. We disagree.

This case turns upon the factual findings of the trial judge. Accordingly, it is controlled by Md. Rule 8–131(c), which states:

(c) *Action tried without a jury.* When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

In *Davis v. Davis,* 280 Md. 119, 372 A.2d 231, *cert. denied,* 434 U.S. 939, 98 S.Ct. 430, 54 L.Ed.2d 299 (1977), Judge Digges said for the Court:

The words of the rule itself make plain that an appellate court cannot set aside factual findings unless they are clearly erroneous, and this is so even when the chancellor has not seen or heard the witnesses. *Sewell v. Sewell,* 218 Md. 63, 71, 145 A.2d 422, 426 (1958); *see, e.g., Dorf v. Skolnik,* 280 Md. 101, 117–118, 371 A.2d 1094, 1103 (1977); *Chalkley v. Chalkley,* 236 Md. 329, 333, 203 A.2d 877, 880 (1964).

*Id.* at 124, 372 A.2d 231.

■ There was testimony to support the findings made by the trial judge. It is elementary that a trier of fact, be it judge or jury, may elect to pick and choose which evidence to

believe. *See Attorney Griev. Comm'n v. Nothstein,* 300 Md. 667, 684, 480 A.2d 807 (1984), and *Attorney Griev. Comm'n v. Kerpelman,* 288 Md. 341, 354, 420 A.2d 940 (1980), *cert. denied,* 450 U.S. 970, 101 S.Ct. 1492, 67 L.Ed.2d 621 (1981). In *Kerpelman,* the Court said:

> In *Racine v. Wheeler,* 245 Md. 139, 144, 225 A.2d 444 (1967), Judge McWilliams said for the Court, "Since the jury is free to believe only a portion of the evidence of each side the synthesis apparently accomplished by the jury is simply a manifestation of its obvious function." This comment continues to have viability. We have said this is no less true when a judge is the trier of fact. *Clemson v. Butler Aviation [Aviation-Friendship],* 266 Md. 666, 672, 296 A.2d 419 (1972), and *Davidson v. Katz,* 254 Md. 69, 80, 255 A.2d 49 (1969).

*Id.* at 354, 420 A.2d 940. The Court's findings were not clearly in error.

Here, the trial court found Mrs. Torboli's testimony not credible, but found the testimony of Mr. Torboli, their daughter, and Mr. Torboli's two friends credible. Mr. Torboli testified that his wife and daughter returned to the marital home sometime in July and stayed there, notwithstanding some absences, until December 15. The daughter corroborated that testimony. She testified that she and her mother stayed at the marital home during this time and that sometimes she and her mother would leave when her parents had a fight. Two of Mr. Torboli's friends testified to a number of occasions when they called the marital home to inquire as to the car pool situation and Mrs. Torboli answered the telephone. In addition, Mrs. Torboli admitted cashing her husband's checks and continuing to pay their household bills from a joint account. Mr. Torboli testified that he and his wife resumed marital relations. Moreover, evidence showed that Mr. Torboli used Mrs. Torboli's car to drive to work on several occasions.

■ Under the circumstances, we find no error in the trial court's conclusion that the parties intended to reconcile during

the period of the protective order. *Cf. Noffsinger v. Noffsinger,* 95 Md.App. 265, 273, 620 A.2d 415, *cert. denied,* 331 Md. 197, 627 A.2d 539 (1993) (reconciliation evidenced by resumption of cohabitation, the assumption by the husband of the wife's charge accounts and mortgage payments, and the husband's cessation of alimony payments).

## II.

Mrs. Torboli argues that the court erred in its legal conclusion that reconciliation nullifies a family maintenance order granted under section 5-404(b) of Maryland's Family Law Article. We again disagree.

In 1980, the General Assembly enacted a domestic violence statute. *See* Md.Code, (1974, 1980 Repl.Vol., 1983 Cumm. Supp.) §§ 4-501, *et seq.* of the Cts. & Jud. Proc. Art. In 1992, the General Assembly significantly broadened the statute's protection, and, for our purposes, included a family maintenance provision. That provision provides in pertinent part that a protective order may include relief in which the court awards:

> emergency family maintenance as necessary to support any person eligible for relief to whom the respondent has a duty of support under this article, including an immediate and continuing withholding order on all earnings of the respondent in the amount of the ordered emergency family maintenance in accordance with the procedures specified in Title 10, Subtitle 1, part III of this article[.]

*See* section 4-506(d)(8). Section 4-507, titled "Modification or recision of orders; appeals[ ]" provides, in pertinent part, that the court that issues the protective order may modify or rescind the protective order after giving notice to all affected persons eligible for relief and respondent, and upon a hearing.

Although there are no Maryland cases discussing the exact question before us, *i.e.,* whether a reconciliation terminates emergency family maintenance payments, *Thomas,* 294 Md. 605, 451 A.2d 1215, to which we have earlier alluded and upon which the trial court relied, is helpful. There, the Court of

Appeals was asked to decide whether a reconciliation, after a divorce *a mensa et thoro* [2], permanently terminates the right to receive alimony under an alimony award contained in the same decree as the divorce. The Court of Appeals decided that it did.

In *Thomas,* the husband, Carlos, sought a divorce *a mensa et thoro* from his wife and custody of their two minor children. His wife, Ida, filed a cross bill for a divorce *a mensa et thoro* or, in the alternative, a divorce *a vinculo matrimonii.* She sought alimony, custody of their children, and child support. Carlos left Maryland for Trinidad and failed to answer his wife's cross bill. Ida moved for a decree *pro confesso* and the court granted her a divorce *a mensa et thoro,* alimony, custody of their two children, and child support. The decree did not contain any time limitations. Carlos returned to Maryland several months later at which time the parties reconciled and resumed cohabitation.

Marital difficulties arose once again, three months later. Carlos and Ida then separated a second time. Unaware of the divorce decree, Carlos filed a new complaint for a divorce *a mensa et thoro* and also sought custody of their children. Ida answered, denying the allegations and pleading *res judicata.* She also filed a petition in the first case to have Carlos held in contempt, alleging that he had failed to pay child support and alimony from the time the divorce was in effect to the date of their second separation.

The *Thomas* Court said:

[T]he court found that $1,700 in alimony arrearage was owed by Carlos Thomas; however, this amount was offset with money left in a bank account by Carlos which Ida Thomas expended, resulting in an $800 alimony overpay-

---

**2.** Divorce *a mensa et thoro* is a "partial or qualified divorce, by which the parties are separated and forbidden to live or cohabit together, without affecting the marriage itself." Divorce *a vinculo matrimonii* is a total disassociation of "the marriage tie and releasing the parties wholly from their matrimonial obligations." *See* Black's Law Dictionary 431 (5 th ed.1979).

ment. As to the period of reconciliation (December 4, 1977, to March 17, 1978), the court found that Mr. Thomas "was not obligated to pay alimony" because "it seems clear that alimony is not to continue upon cohabitation and that reconciliation causes alimony to cease during the period of reconciliation." The court alternatively held that "the parties' reconciliation constituted a substantial change in circumstances justifying modification."

*Id.* at 608, 451 A.2d 1215.

On appeal, we affirmed the lower's court's nullification of the alimony award during the period of reconciliation but reversed that part of the order which ruled that future alimony obligations were not affected. On the contrary, we held that the alimony obligation ceases upon a *bona fide* reconciliation. The Court of Appeals affirmed. After a thorough review of divorce and alimony law, the Court of Appeals held that reconciliation permanently terminates an award of alimony whether or not that award is contained in the same decree as the divorce. *Id.* at 619–20, 451 A.2d 1215. Given that reconciliation may be over a long period, the Court held that an award of alimony should not automatically revive upon a subsequent separation because the circumstances might very well be different after a long period of reconciliation. Thus, the Court held that a spouse seeking alimony after a subsequent separation must reapply to a court of equity. *Id.* at 621, 451 A.2d 1215.

■ The question before us is narrow, *i.e.,* whether payments under an emergency family provision of a protective order are enforceable during reconciliation.[3] We hold that the emergency family provision of a protective order is nullified upon the parties' reconciliation. We find *Thomas* persuasive, although not directly on point. We explain.

---

**3.** We do not answer the related questions of whether the parties' cohabitation nullifies the entire protective order or whether the emergency family payments are reinstated after the parties' second separation.

■  The obvious purpose of the family maintenance order is to provide financial support to those eligible for relief while the parties are separated. This undoubtedly is intended to cover their food, clothing, and shelter. It follows that if the parties reconcile during the period of the protective order they are no longer separated and this provision for financial support is no longer necessary.

Not surprisingly, Mrs. Torboli offers several reasons why *Thomas* is not applicable here. First, she points out that *Thomas* concerns alimony (payment for the benefit of a spouse), while this case concerns family maintenance (payment for the benefit of a spouse and any dependents). Second, she says *Thomas* concerned alimony awards that might last for years but protective orders, at the time of this case, could be for no longer than 200 days.[4] Third, the domestic violence statute specifically provides for modification or recision of protective orders only upon review by a court after notice to all parties and a hearing.

■  The first argument, under the circumstances of this case, is of little significance. By the account of both parties, the daughter resided with her mother during the term of the protective order. During that time, Mrs. Torboli spent her time, with some absences, at the marital home. Thus, during most of the term of the protective order the family unit was maintained at the marital home. Second, we fail to see how the fact that protective orders under the current statute may last up to a year affects the reasoning of our holding. Lastly, although the statute provides a legal route for modifying a protective order, we believe that the parties can modify the order by their conduct, just as was the case as to alimony in *Thomas*. As Judge Prescott said for the Court of Appeals in a different context, "[T]he law does not permit separated spouses to litigate by day and copulate by night." *Sullivan v.*

---

4. Effective October 1, 1997, protective orders may be effective for a period not to exceed 12 months. *See* § 4–506(g)(1) of the Family Law Article.

**678**

*Sullivan,* 234 Md. 67, 75, 197 A.2d 910 (1964) (assertion of constructive desertion not legally compatible with separation).

**JUDGMENT AFFIRMED.**

**COSTS TO BE PAID BY APPELLANT.**